# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UFCW LOCAL 1500 WELFARE FUND, on behalf of itself and all others similarly situated,<br><br>       *Plaintiff*,<br><br> v.<br><br>ABBVIE INC., ALLERGAN, INC., ALLERGAN SALES, LLC, ALLERGAN USA, INC., FOREST LABORATORIES, INC., FOREST LABORATORIES HOLDINGS, LTD., FOREST LABORATORIES IRELAND, LTD., and FOREST LABORATORIES, LLC,<br><br>       *Defendants*. | Case No. __-cv-_____<br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

THE PARTIES.................................................................................................... 9

    A.    Plaintiff................................................................................................ 9

    B.    Defendants.......................................................................................... 10

    C.    Co-conspirators ................................................................................. 12

JURISDICTION AND VENUE ....................................................................... 15

REGULATORY BACKGROUND ................................................................... 16

    A.    FDA New Drug Approval Process ..................................................... 18

    B.    The Hatch-Waxman Act Encourages and Facilitates Generic Drug
        Approvals .......................................................................................... 20

    C.    Brand Manufacturers and First Filers Can Manipulate the Regulatory
        Structure to Delay the Emergence of Generic Competition................... 22

FACTUAL ALLEGATIONS ............................................................................ 26

    A.    Bystolic ............................................................................................. 26

    B.    Basic Chemistry Relating to the Active Pharmaceutical Ingredient in
        Bystolic............................................................................................. 26

    C.    Forest's Bystolic Patents ................................................................... 30

    D.    The Generic Competitors File ANDAs for Generic Versions of Bystolic ............ 36

    E.    The Bystolic Patent Litigation........................................................... 37

    F.    Forest Enters into Unlawful Pay-for-Delay Agreements with the Generic
        Competitors ....................................................................................... 40

ANTICOMPETITIVE EFFECT ....................................................................... 46

ANTITRUST IMPACT ..................................................................................... 47

EFFECTS ON INTRASTATE AND INTERSTATE COMMERCE.................... 48

MONOPOLY POWER AND MARKET DEFINITION..................................... 48

CLASS ACTION ALLEGATIONS .................................................................. 50

FRAUDULENT CONCEALMENT AND CONTINUING VIOLATIONS ............................... 54

    A.    Defendants Fraudulently Concealed Their Anticompetitive Scheme ................... 54

    B.    Defendants' Continuing Violations of the Antitrust Laws ..................................... 56

CLAIMS FOR RELIEF ......................................................................................................... 56

    CLAIM ONE VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15
    U.S.C. § 1 (AGREEMENT NOT TO COMPETE BETWEEN DEFENDANTS
    AND HETERO) ................................................................................................... 56

    CLAIM TWO VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15
    U.S.C. § 1 (AGREEMENT NOT TO COMPETE BETWEEN DEFENDANTS
    AND TORRENT) ................................................................................................. 58

    CLAIM THREE VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15
    U.S.C. § 1 (AGREEMENT NOT TO COMPETE BETWEEN DEFENDANTS
    AND ALKEM) .................................................................................................... 59

    CLAIM FOUR VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15
    U.S.C. § 1 (AGREEMENT NOT TO COMPETE BETWEEN DEFENDANTS
    AND INDCHEMIE) ............................................................................................ 61

    CLAIM FIVE VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15
    U.S.C. § 1 (AGREEMENT NOT TO COMPETE BETWEEN DEFENDANTS
    AND GLENMARK) ............................................................................................ 62

    CLAIM SIX VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15
    U.S.C. § 1 (AGREEMENT NOT TO COMPETE BETWEEN DEFENDANTS
    AND AMERIGEN) ............................................................................................. 64

    CLAIM SEVEN VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15
    U.S.C. § 1 (AGREEMENT NOT TO COMPETE  BETWEEN DEFENDANTS
    AND WATSON) .................................................................................................. 65

    CLAIM EIGHT VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15
    U.S.C. § 2 (MONOPOLIZATION AND MONOPOLISTIC SCHEME) ........................ 67

    CLAIM NINE CONTRACT, COMBINATION, CONSPIRACY, OR
    ARRANGEMENT IN VIOLATION OF STATE ANTITRUST LAWS
    (AGREEMENT NOT TO COMPETE BETWEEN DEFENDANTS AND
    HETERO) ............................................................................................................ 68

    CLAIM TEN CONTRACT, COMBINATION, CONSPIRACY, OR
    ARRANGEMENT IN VIOLATION OF STATE ANTITRUST LAWS
    (AGREEMENT NOT TO COMPETE BETWEEN DEFENDANTS AND
    TORRENT) .......................................................................................................... 72

CLAIM ELEVEN CONTRACT, COMBINATION, CONSPIRACY, OR
ARRANGEMENT IN VIOLATION OF STATE ANTITRUST LAWS
(AGREEMENT NOT TO COMPETE BETWEEN DEFENDANTS AND
ALKEM) .................................................................................................................... 76

CLAIM TWELVE CONTRACT, COMBINATION, CONSPIRACY, OR
ARRANGEMENT IN VIOLATION OF STATE ANTITRUST LAWS
(AGREEMENT NOT TO COMPETE BETWEEN DEFENDANTS AND
INDCHEMIE) ............................................................................................................ 80

CLAIM THIRTEEN CONTRACT, COMBINATION, CONSPIRACY, OR
ARRANGEMENT IN VIOLATION OF STATE ANTITRUST LAWS
(AGREEMENT NOT TO COMPETE  BETWEEN DEFENDANTS AND
GLENMARK) ............................................................................................................ 84

CLAIM FOURTEEN CONTRACT, COMBINATION, CONSPIRACY, OR
ARRANGEMENT IN VIOLATION OF STATE ANTITRUST LAWS
(AGREEMENT NOT TO COMPETE BETWEEN DEFENDANTS AND
AMERIGEN) ............................................................................................................. 89

CLAIM FIFTEEN CONTRACT, COMBINATION, CONSPIRACY, OR
ARRANGEMENT IN VIOLATION OF STATE ANTITRUST LAWS
(AGREEMENT NOT TO COMPETE BETWEEN DEFENDANTS AND
WATSON) ................................................................................................................. 93

CLAIM SIXTEEN MONOPOLIZATION AND MONOPOLISTIC SCHEME IN
VIOLATION OF STATE ANTITRUST LAW ...................................................... 97

CLAIM SEVENTEEN CONDUCT IN VIOLATION OF  STATE CONSUMER
PROTECTION LAWS ........................................................................................... 100

PRAYER FOR RELIEF ...................................................................................................... 105

JURY TRIAL DEMANDED .............................................................................................. 106

Plaintiff UFCW Local 1500 Welfare Fund, on behalf of itself and all others similarly situated, brings this Class Action Complaint against AbbVie, Inc. ("AbbVie"); Allergan, Inc., Allergan Sales, LLC, and Allergan USA, Inc. (collectively, "Allergan"); and Forest Laboratories, Inc., Forest Laboratories Holdings, Ltd., Forest Laboratories, LLC, and Forest Laboratories Ireland Ltd. (collectively, "Forest") (together, AbbVie, Allergan, and Forest are "Defendants") for claims under the Sherman Act and various state laws for injunctive relief and to recover damages for the substantial injuries it and others similarly situated have sustained, and continue to sustain, arising from Defendants' anticompetitive conduct. Plaintiff's allegations are based on personal knowledge as to Plaintiff and Plaintiff's own actions and upon information and belief as to all other matters.

## INTRODUCTION

1.    This action arises from Defendants' unlawful scheme to exclude generic competition for Bystolic® (nebivolol HCl tablet), a drug used to treat high blood pressure.[1] Forest and its successors manufacture and sell Bystolic, which has generated $1 billion in sales annually.

2.    Generics drugs are typically sold at a significant discount to their branded counterparts, enabling consumers and insurers (payors) to save hundreds of millions of dollars. These price differences, along with state laws requiring or encouraging automatic substitution of less expensive generics for branded products at the pharmacy, typically cause generics to take 80% or more of the sales of a drug molecule from the brand name product within six months of generic entry.

---

[1] For purposes of this Complaint, "Bystolic" refers to the branded Bystolic, "AB-rated versions of Bystolic" refers to generic versions of nebivolol HCl, and "Nebivolol HCl" refers to both Bystolic and AB-rated generic versions of Bystolic.

3.      In December 2011, several generic drug manufacturers—including (1) Hetero
USA, Inc. and Hetero Labs Ltd. ("Hetero"), (2) Torrent Pharmaceuticals Ltd., and Torrent
Pharma, Inc. ("Torrent"), (3) Alkem Laboratories Ltd. ("Alkem"), (4) Indchemie Health
Specialties Private Ltd. ("Indchemie"), (5) Glenmark Generics Inc., USA, Glenmark Generics
Ltd., and Glenmark Pharmaceuticals S.A. ("Glenmark"), (6) Amerigen Pharmaceuticals, Inc. and
Amerigen Pharmaceuticals, Ltd. ("Amerigen"), and (7) Watson Pharma, Inc. and Watson
Pharmaceuticals, Inc. ("Watson") (collectively, the "Generic Competitors")—submitted
Abbreviated New Drug Applications ("ANDAs") seeking FDA approval to market generic
versions of Bystolic. Each Generic Competitor made a certification in its application—known as
a Paragraph IV certification—stating that a particular patent purportedly covering Bystolic (U.S.
Patent No. 6,545,040 (the "'040 Patent")), was invalid, unenforceable or not infringed by its
product. Because each was among the "first ANDA applicants to submit a substantially compete
ANDA with a paragraph IV certification for Nebivolol Tablets, 2.5 mg, 5 mg, 10 mg, and 20
mg," each Generic Competitors was eligible to share 180 days of marketing exclusivity to all
other ANDA generics (but not to an authorized generic of Bystolic licensed by the brand
manufacturer).

4.      Forest sued the Generic Competitors, accusing each of infringing the '040 Patent.
These suits, filed in mid-March 2012, automatically triggered 30-month stays on the FDA's
ability to approve of generic versions of Bystolic. This meant that absent an earlier favorable
decision for the Generic Competitors or a dismissal of the actions, the FDA was unable to
approve any generic version of Bystolic until June 18, 2015. And foreclosing the Generic
Competitors from launching also foreclosed all other generic manufacturers because their shared

180 days of exclusivity meant that no other ANDA generic could launch until the lapse of that exclusivity period.

5.    From March 2012 through November 2013, while the stays were in effect, the Generic Competitors fought the patent infringement suits and prepared to bring their AB-rated generic Bystolic products to the market to compete with Forest's branded Bystolic. At least six of the seven Generic Competitors would have been ready to launch well before September 17, 2021, as each had final FDA approval to do so as set forth in the table below:

| Manufacturer | ANDA No. | Final Approval Date |
|---|---|---|
| Amerigen | 203659 | 4/16/15 |
| Watson | 203683 | 11/27/15 |
| Alkem | 203741 | 6/24/15 |
| Glenmark | 203821 | 5/25/17 |
| Indchemie | 203828 | 7/29/15 |
| Torrent | 203966 | 3/2/18 |

6.    The Generic Competitors would have succeeded in the patent litigation because the '040 Patent was weak. The '040 Patent litigation, including all appeals, likely would have concluded by mid-2015. The Generic Competitors would have won and launched by the later of: (a) June 2015, which was the expiry of the only other patent that Forest contended covered Bystolic, U.S. Patent No. 5,759,580 (the "'580 Patent") or (b) the date their Abbreviated New Drug Applications ("ANDAs") were finally approved.

7.    But rather than risk facing competition from the Generic Competitors as early as June 2015—and the subsequent reduction in Bystolic brand sales and revenues such competition would cause—from October 2012 through November 2013, Forest engineered a series of unlawful "pay for delay" deals (also known as "reverse-payment" deals) with each of its would-be generic competitors—Hetero, Torrent, Alkem, Indchemie, Glenmark, Amerigen, and Watson.

3

8.      Pursuant to these deals, each generic (1) agreed not to compete with Forest or enter the market prior to September 17, 2021, unless another generic competitor entered the market earlier and, in exchange, (2) received "side-deals," and cash payments, the precise amounts of which have not been publicly disclosed except that, they each exceed $15,000,000 in value.

9.      The substantial value the Generic Competitors received from these side deals can be ascertained from Defendants' own documents. In a March 4, 2014 email, Forest's outside lawyers, who were reviewing Forest's documents as part of their "work on the Actavis merger agreement,"[2] informed Forest's in-house counsel Eric Agovino that "[b]efore we engage in any discussions with the FTC . . . we think it would be prudent for us to review all of the Bystolic settlement and licensing agreements *as well as the side agreements with those generic companies*." Mr. Agovino's response, reprinted below, identified seven patent settlements with each Generic Competitor, each of which had "side deals":[3]

---

[2] *In re Namenda Direct Purchaser Antitrust Litig.*, 15-cv-07488 (S.D.N.Y. Mar. 7, 2019) (ECF No. 680-44 at 332).

[3] *Id.* (emphasis added).

To:        'Malester, Ann'[]; Newborn, Steven[steven.newbom@weil.com]
From:      Agov[]Case 1:15-cv-07488-CM-RWL    Document 680-44    Filed 03/07/19    Page 332 of 419
Sent:      Tue 3/4/2014 7:47:28 PM
Importance:    Normal
Subject:   RE: Namenda settlements
Received:      Tue 3/4/2014 7:47:00 PM
EXECUTED Forest-Hetero Settlement and License Agreement.pdf
EXECUTED Term Sheet (Hetero).pdf

We entered into settlement agreements with the following defendants:

1) Hetero

2) Torrent

3) Alkem

4) Indchemie

5) Glenmark

6) Amerigen

7) Actavis

All had side deals (one side was struck with Alkem, which is a related company with Indchemie).

Attached are the Hetero agreements.

10.    Forest's February 17, 2014 Agreement and Plan of Merger with Actavis PLC (the "Merger Agreement") provides additional details. Specifically, in the Merger Agreement Forest disclosed its "material contracts," which are defined to include:

> any Contract involving the settlement of any action (or threatened action (or series of related actions) (A) which will (x) involve payments after the date hereof of **_consideration in excess of $15,000,000_** or (y) impose monitoring or reporting obligations to any other Person outside the ordinary course of business or (B) with respect to which material conditions precedent to the settlement have not been satisfied.[4]

11.    Forest listed each of the side-deals as a "material contract" "in connection with the settlement of Bystolic patent dispute." The respective contracts are set forth below:

(a)    **Hetero**: "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd, and Hetero USA Inc. and Hetero Labs Ltd. dated October 24, 2012 . . . together with the FINAL TERM SHEET between Hetero Drugs Ltd. and

---

[4] _In re Namenda Direct Purchaser Antitrust Litig._, 15-cv-07488 (S.D.N.Y. Mar. 7, 2019) (ECF No. 680-22 at 69) (emphasis added).

⏎

Forest Laboratories Ireland Ltd. dated October 5, 2012, in connection with the settlement of BYSTOLIC patent dispute."[5]

      (b)   **Torrent**: "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Torrent Pharmaceuticals Ltd. and Torrent Pharma Inc. dated November 21, 2012 . . . together with the PATENT ASSIGNMENT AGREEMENT between Torrent Pharmaceuticals Ltd and Forest Laboratories Holdings Ltd. dated November 21, 2012, in connection with the settlement of BYSTOLIC patent dispute."[6]

      (c)   **Alkem/Indchemie**: "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Alkem Laboratories Ltd. dated November 27, 2012 . . . together with the TERM SHEET between Alkem Laboratories Ltd., Indchemie Health Specialties Private Ltd., and Forest Laboratories Ireland Ltd. dated November 28, 2012, in connection with the settlement of BYSTOLIC patent dispute. AMENDMENT NO. 1 TO SETTLEMENT AGREEMENT was executed on January 9, 2013" and "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd, and Indchemie Health Specialties Private Ltd. dated November 27, 2012 . . . together with the TERM SHEET between Alkem Laboratories Ltd, Indchemie Health Specialties Private Ltd, and Forest Laboratories Ireland Ltd. dated November 28, 2012, in connection with the settlement of BYSTOLIC patent dispute."[7]

      (d)   **Glenmark**: "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd, and Glenmark Generics Inc., USA and Glenmark Generics Ltd. dated December 21, 2012 . . . together with the COLLABORATION

---

[5] *Id*. at 179

[6] *Id*.

[7] *Id*.

AND OPTION AGREEMENT between Glenmark Pharmaceuticals S.A. and Forest Laboratories Holdings Ltd. dated December 21, 2012, in connection with the settlement of BYSTOLIC patent dispute."[8]

(e)    **Amerigen**: "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Amerigen Pharmaceuticals, Inc. and Amerigen Pharmaceuticals, Ltd. dated July 18, 2013 . . . together with the BINDING TERM SHEET COLLABORATION AGREEMENT between Forest Laboratories, Inc. and Amerigen Pharmaceuticals, Ltd. dated July 18, 2013, in connection with the settlement of BYSTOLIC patent dispute."[9]

(f)    **Watson**: "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Watson Laboratories, Inc. (NV), Watson Laboratories, Inc. (DE), Watson Laboratories, Inc. (NY), Watson Laboratories, Inc. (CT), Watson Pharma, Inc., and Actavis, Inc. dated November 6, 2013 . . . together with (a) the LETTER from Forest Laboratories, Inc. to Moksha8, Inc. dated November 1, 2013 and (b) TERMINATION AND RELEASE AGREEMENT between Actavis, Inc. and Moksha8, Inc. dated November 4, 2013, in connection with the settlement of BYSTOLIC patent dispute."[10]

12.    In addition to the consideration Forest provided each Generic Competitor in the form of a side-deal, Forest "agreed to reimburse certain of the Settling Defendants' legal costs in connection with the patent litigation."[11]

---

[8] *Id.*

[9] *Id.* at 180.

[10] *Id.*

[11] Forest Laboratories, Inc., Form 10-K, at 76 (May 23, 2013), https://www.sec.gov/Archives/edgar/data/38074/000003807413000014/forest10k2013.htm.

13.     Forest also disclosed that its settlement agreements with the Generic Competitors "provide[d] a license to each of the Settling Defendants that will permit them to launch their respective generic versions of Bystolic as of the date that is the later of (a) three calendar months prior to the expiration of the '040 patent, including any extensions and/or pediatric exclusivities or **(b) the date that each Settling Defendant receives final FDA approval of its ANDA, or earlier in certain circumstances**."[12] The bolded language typically refers to what is known as a "contingent launch provision" ("CLP"), or an "acceleration clause."

14.     CLPs ensure a settling generic that it will not be competitively disadvantaged should a later-settling generic negotiate an earlier licensed entry date or otherwise come to market earlier: pursuant to the CLPs the first-settling generic's entry date may be "accelerated" permitting it to enter the market at the same time as any of its competitors.

15.     When CLPs are used, they generally operate the same way in each ANDA filer's settlement agreement. Here, each first ANDA filer agreed to delay the launch of its generic product from the date of settlement until exactly three months before the expiration of the '040 Patent[13] *if and only if* all other first-filer generic companies followed suit (which they did). By brokering the agreements, Forest ensured that, without regard to the strength of the Generic Competitors' challenges to the '040 Patent, Bystolic would have no generic competitors, and Forest would maintain patent-generated monopoly profits until at least September 17, 2021.

16.     Pay-for-delay agreements like the side-deals in this case delay the entry date for generic drug products beyond the date when competition would ensue in the absence of a reverse-payment. Absent these reverse payments, the Generic Competitors would have launched

---

[12] *Id.* (emphasis added).

[13] *Id.*

their generic products earlier either: (a) at risk; (b) upon prevailing against Forest in the underlying patent litigation; or (c) via lawful settlement agreements providing for earlier negotiated entry dates untainted by the delay caused by the unlawful reverse-payments. Had any of the above scenarios played out—as would have occurred absent the unlawful reverse-payments—Plaintiff and the Classes would have paid substantially less for Nebivolol HCl.

17.    Defendants' conduct was designed to, did, and continues to: (a) delay the entry of less expensive, AB-rated generic versions of Bystolic; (b) fix, raise, maintain or stabilize the prices of Nebivolol HCl; and (c) allocate 100% of the U.S. Nebivolol HCl market to themselves until three months before expiration of the '040 Patent.

18.    To remedy past and ongoing injury to Plaintiff and members of the Classes (defined below), Plaintiff brings this action on behalf of itself and all others similarly situated to restrain Defendants' anticompetitive conduct and restore competition to the Nebivolol HCl marketplace. Plaintiff also seeks damages under state law to compensate it and all others similarly situated who have overpaid, and will continue to overpay, for Nebivolol HCl.

### THE PARTIES

**A.    Plaintiff**

19.    Plaintiff UFCW Local 1500 Welfare Fund ("Local 1500") is an employee welfare benefits fund with its principal place of business at 425 Merrick Avenue, Westbury, New York 11530. Local 1500 provides nearly 23,000 plan participants with health and welfare benefits and, with 15,000 members, is the largest grocery union in New York. During the Class Period (as defined below), Local 1500 indirectly purchased, paid, or reimbursed for some or all of the purchase price for Bystolic. Local 1500 made such payments and/or reimbursements for members purchasing Bystolic at pharmacies located in Arizona, Missouri, New York, and New Jersey. Local 1500 paid and reimbursed more for these products than it would have absent

Defendants' anticompetitive conduct and, accordingly, suffered injury to its business and property.

**B.    Defendants**

20.    Defendant Forest Laboratories, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 909 Third Avenue, New York, NY 10022.

21.    Defendant Forest Laboratories Ireland, Ltd. is an Irish Corporation with a place of business at Clonshaugh Industrial Estate, Dublin 17, Ireland.

22.    Defendant Forest Laboratories Holdings, Ltd. is a Bermudian corporation having a principal place of business at 18 Parliament Street, Hamilton HM 11, Bermuda. In or around February 2006, Defendant Forest Laboratories Ireland, Ltd. changed its name to Forest Laboratories Holdings, Ltd. and changed its residence from Ireland to Bermuda.

23.    Defendant Forest Laboratories, LLC is a company organized and existing under the laws of Delaware, with its principal place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, NJ 07054. On July 1, 2014, in a series of transactions, Forest Laboratories, Inc. became a limited liability company named Forest Laboratories, LLC. On July 1, 2014, Actavis PLC ("Actavis") acquired Defendant Forest. On May 17, 2015 Actavis acquired Defendant Allergan, Inc. but maintained the name Allergan for its ongoing operations. Subsequently, on January 1, 2018, Forest Laboratories, LLC was merged with and into Defendant Allergan Sales, LLC, a Delaware limited liability company. As a result of these corporate consolidations, the Forest Defendants are predecessors in interest to Allergan Sales, LLC.

24.     Defendant Allergan Sales, LLC is a company organized and existing under the laws of Delaware, with its principal place of business at 5 Giralda Farms, Madison, New Jersey 07940.

25.     Defendant Allergan, Inc. is a Delaware corporation with its principal place of business located at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey 07054.

26.     Defendant Allergan USA, Inc. is a Delaware corporation with its principal place of business at 5 Giralda Farms, Madison, New Jersey 07940.

27.     Allergan, through its merger with Forest, assumed responsibility for performance of the challenged provisions in the agreements, continued to perform those provisions, and benefited from making direct sales of Bystolic to Plaintiff and members of the proposed Classes at the supracompetitive prices made possible by the delay those challenged provisions produced.

28.     Forest assigned the pay-for-delay agreements to Allergan, and Allergan never withdrew from them.

29.     Allergan joined the ongoing unlawful course of conduct—and joined the unlawful pay-for-delay agreements—with respect to the suppression of generic competition for Bystolic. Allergan did not withdraw from those conspiracies and instead continued to participate in them.

30.     Defendant AbbVie, Inc. is a corporation organized and existing under the laws of Delaware with its corporate headquarters at 1 North Waukegan Road, North Chicago, Illinois 60064. AbbVie is the corporate successor to Allergan and Forest, having completed its purchase of Allergan on May 8, 2020.

31.     Defendant AbbVie, through its merger with Allergan, assumed responsibility for performance of the challenged provisions in the agreements, continued to perform those

provisions, and benefited from making direct sales of Bystolic to Plaintiff and members of the proposed Class at the supracompetitive prices made possible by the delay those challenged provisions produced.

32.     Allergan assigned the pay-for-delay agreements to AbbVie, and AbbVie never withdrew from them but rather joined the ongoing unlawful course of conduct—and joined the unlawful pay-for-delay agreements—with respect to the suppression of generic competition for Bystolic.

## C.     Co-conspirators

33.     Watson Pharma, Inc. was an initiator of and is a participant in the unlawful conspiracy described in this complaint. Watson Pharma, Inc. is a corporation organized and existing under the laws of Delaware, having a place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, NJ 07054.

34.     Watson Pharmaceuticals, Inc. was an initiator of and is a participant in the unlawful conspiracy described in this complaint. Watson Pharmaceuticals, Inc. is a corporation organized and existing under the laws of the State of Nevada, having places of business at 311 Bonnie Circle, Corona, CA 92880 and 360 Mount Kemble Avenue, Morristown, NJ 07962, and its corporate headquarters at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, NJ 07054.

35.     Torrent Pharmaceuticals Ltd. was an initiator of and is a participant in the unlawful conspiracy described in this complaint. Torrent Pharmaceuticals Ltd. is an Indian corporation having a principal place of business at Off. Ashram Road, Ahmedabad - 380 009, Gujarat, India.

36.     Torrent Pharma Inc. was an initiator of and is a participant in the unlawful conspiracy described in this complaint. Torrent Pharma Inc. is a corporation organized and

existing under the laws of the State of Delaware, having a principal place of business at 5380 Holiday Terrace, Suite 40, Kalamazoo, MI 49009. Torrent Pharma Inc. is a wholly-owned subsidiary of Torrent Pharmaceuticals Ltd. Torrent Pharma Inc. acts as the agent of Torrent Pharmaceuticals Ltd.

37.     Amerigen Pharmaceuticals Ltd. was an initiator of and is a participant in the unlawful conspiracy described in this complaint. Amerigen Pharmaceuticals Ltd. is a Chinese company having places of business at 197 State Route 18S, Suite 306N, East Brunswick, NJ 08816 and No. 58, Qunxing Yi Road, Suzhou Industrial Park, PRC. 215006.

38.     Amerigen Pharmaceuticals Inc. was an initiator of and is a participant in the unlawful conspiracy described in this complaint. Amerigen Pharmaceuticals Inc. is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 197 State Route 18S, Suite 306N, East Brunswick, NJ 08816. Amerigen Pharmaceuticals Inc. is a wholly-owned subsidiary of Amerigen Pharmaceuticals Ltd. Amerigen Pharmaceuticals Inc. acts as the agent of Amerigen Pharmaceuticals Ltd.

39.     Glenmark Generics Inc., USA was an initiator of and is a participant in the unlawful conspiracy described in this complaint. Glenmark Generics Inc. is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 750 Corporate Drive, Mahwah, NJ 07430. Glenmark Generics Inc. is the same entity as Glenmark Generics Inc., USA. To the extent Glenmark Generics Inc. is an entity separate and apart from Glenmark Generics Inc., USA, any allegations in this Complaint relating to Glenmark Generics Inc., USA shall apply equally to Glenmark Generics Inc.

40.     Glenmark Generics Ltd. was an initiator of and is a participant in the unlawful conspiracy described in this complaint. Glenmark Generics Ltd. is an Indian company having a

place of business at Glenmark House, HDO-Corporate Building, Wing -A, B D Sawant Marg,

Chakala, Off Western Express Highway, Mumbai 400099, Maharashtra, India.

41.     Defendant Glenmark Pharmaceuticals Ltd. was an initiator of and is a participant

in the unlawful conspiracy described in this complaint. Glenmark Pharmaceuticals Ltd. is an

Indian corporation having a principal place of business at Glenmark House, HDO-Corporate

Building, Wing-A, B D Sawant Marg, Chakala, Off Western Express Highway, Mumbai 400099,

Maharashtra, India. Glenmark Generics Inc., USA and Glenmark Generics Ltd. are wholly-

owned subsidiaries of Glenmark Pharmaceuticals Ltd. Glenmark Generics Inc., USA is the North

American division of Glenmark Generics Ltd. Glenmark Generics Inc., USA, Glenmark

Generics Ltd., and Glenmark Pharmaceuticals Ltd. have officers and directors in common.

Glenmark Generics Inc., USA acts as the agent of Glenmark Generics Ltd. and Glenmark

Pharmaceuticals Ltd.

42.     Hetero Labs Ltd. was an initiator of and is a participant in the unlawful

conspiracy described in this complaint. Hetero Labs Ltd. is an Indian corporation having a

principal place of business at 7-2-A2, Hetero Corporate Industrial Estate, Sanathnagar

Hyderabad 500018 Andhra Pradesh, India.

43.     Hetero USA Inc. was an initiator of and is a participant in the unlawful conspiracy

described in this complaint. Hetero USA Inc. is a corporation organized and existing under the

laws of the State of Delaware, having a principal place of business at 1031 Centennial Avenue,

Piscataway, NJ 08854. Hetero USA Inc. is a wholly-owned subsidiary of Hetero Labs Ltd.

Hetero USA Inc. acts as the agent of Hetero Labs Ltd.

44.     Indchemie Health Specialties Private Ltd. was an initiator of and is a participant

in the unlawful conspiracy described in this complaint. Indchemie Health Specialties Private Ltd.

is an Indian company having a place of business at 510, Shah & Nahar Industrila Estate, Dr. E.

Moses Road, Worli-Mumbai 400018, India.

45.     Alkem Laboratories Ltd. was an initiator of and is a participant in the unlawful

conspiracy described in this complaint. Alkem Laboratories Ltd. is an Indian company having a

place of business at Alkem House, Devashish, Senapati Bapat Marg, Lower Parel (West),

Mumbai 400013, Maharashtra, India.

46.     All of the Defendants' and co-conspirators' actions described in this complaint

are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized,

ordered, and/or done by the Defendants' and co-conspirators' various officers, agents,

employees, or other representatives while actively engaged in the management of the

Defendants' and co-conspirators' affairs (or that of their predecessors-in-interest) within the

course and scope of their duties and employment, and/or with the actual, apparent, and/or

ostensible authority of the Defendants and co-conspirators.

## JURISDICTION AND VENUE

47.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331 and 1337 and Section 16 of the Clayton Act, 15 U.S.C. § 26, because this action arises

under the federal antitrust laws. This Court also has subject matter jurisdiction under 28 U.S.C. §

1332(d) and 28 U.S.C. § 1367.

48.     Venue is appropriate within this district under 15 U.S.C. § 15(a), 15 U.S.C. § 22

(nationwide venue for antitrust matters), and 28 U.S.C. § 1391(b) (general venue provision).

Defendants resided, transacted business, were found, or had agents within this District, and a

portion of the affected interstate trade and commerce discussed below was carried out in this

District. Defendants' conduct, as described in this Complaint, was within the flow of, was

intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this District.

49.    The Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## REGULATORY BACKGROUND

50.    Generic competition allows purchasers at all levels of the pharmaceutical chain of distribution to purchase generic drugs at prices lower than those drugs' brand counterparts. Generic competition to a single brand drug can provide potentially billions of dollars in savings to consumers, pharmacies, and other drug purchasers, as well as to private health insurers or state Medicaid programs, both of which reimburse the cost of drug purchases by covered individuals.

51.    The FDA sets the standards for the approval of generic drugs. Upon satisfaction of FDA regulations governing, among other things, safety, efficacy, and labeling, the FDA confers upon a generic drug a therapeutic equivalence rating from AA to BX. Typically an "A" (i.e., AA, AB, AN, AO, AP, AT) rated generic is assigned, "those for which there are no known or suspected bioequivalence problems or for which actual or potential bioequivalence problems have been resolved with adequate in vivo and/or in vitro evidence supporting bioequivalence."[14] As defined in the regulations, bioequivalence is:

---

[14] Orange Book Preface (38th ed.),
https://www.fda.gov/Drugs/DevelopmentApprovalProcess/ucm079068.htm.

> the absence of a significant difference in the rate and extent to
> which the active ingredient or active moiety in pharmaceutical
> equivalents or pharmaceutical alternatives becomes available at the
> site of drug action when administered at the same molar dose
> under similar conditions in an appropriately designed study.[15]

52.    The A rating permits the generic drug to be substituted for the brand drug at a pharmacy counter. All States permit—and indeed, some States require—pharmacists to substitute an A-rated generic drug for the corresponding brand drug, unless the prescribing healthcare provider has specifically stated that the brand drug is to be used.

53.    Many health insurers and other third-party payors have adopted policies to encourage the substitution of A-rated generic drugs for their brand name counterparts. For example, many third-party payors implement a tiering system that places certain drugs on different benefit tiers. A drug that is placed on one tier may receive only partial reimbursement, while a drug placed on another tier may receive full reimbursement. Typically, branded drugs are placed on a different tier than their corresponding generic. Furthermore, branded drugs with a generic equivalent are usually subject to smaller reimbursements or higher co-pays, while generic drugs will be given total (or near total) reimbursement with a limited, or no, co-pay.

54.    As a result of these policies, healthcare professionals are incentivized to prescribe generics so that they can receive higher reimbursements. In addition, these policies also incentivize end users to request generic drugs because of the cost savings they may receive with respect to their co-pay.

55.    Because both healthcare professionals and end-users are economically incentivized to prefer generic drugs, A-rated generics are usually able to capture a substantial portion of the market.

---

[15] 21 C.F.R. § 320.1(e).

56.     The first A-rated generic is typically priced at a discount to its brand counterpart. As additional A-rated generics obtain FDA approval to enter the market, the resulting increase in competition causes prices of both the first generic and the brand counterpart to drop dramatically.

57.     Empirical studies show that within a year of generic entry, generics will have obtained about 90% of the market, i.e., pharmacists fill 90 of every 100 prescriptions for the compound with an A-rated generic. Indeed, an FTC study found that in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug prices."[16]

### A.     FDA New Drug Approval Process

58.     The Federal Food, Drug and Cosmetic Act (the "FDCA") and its accompanying regulations set the standards for the approval of any new drug compound that is to be marketed, sold, or distributed in the United States. Drug manufacturers seeking to gain FDA approval for a new drug must file a New Drug Application ("NDA"). Applicants filing an NDA are required to provide a host of information demonstrating the safety and efficacy of their drug, including, but not limited to: (1) information and studies regarding the chemistry of the drug substance, which includes information concerning how the drug is manufactured; (2) information and studies regarding nonclinical pharmacology and toxicology for the new drug; (3) information and studies regarding the human pharmacokinetics and bioavailability; and (4) information and data from clinical studies on human subjects.[17]

---

[16] FTC Staff Study, Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions, at 8 (Jan. 2010), available at http://emmanuelcombe.org/delay.pdf.

[17] *See* 21 C.F.R. § 314.50(c)-(d).

59.     Upon satisfying FDA regulations concerning efficacy, safety and labeling, the FDA will approve the NDA, permitting the applicant to market, sell, and distribute the approved drug to the U.S. public.

60.     In addition, upon receiving FDA approval, the brand manufacturer will list any patents it believes cover the approved drug in a publication called the "Approved Drug Products with Therapeutic Equivalence Evaluations," which is more commonly referred to as the "Orange Book."[18]

61.     However, only drug substance patents (active ingredient), drug product patents (formulation and composition), and method-of-use patents qualify for listing in the Orange Book.[19] Thus, for example, process patents covering a new drug are not eligible for listing (although they may be asserted in a future patent litigation against any allegedly infringing product).

62.     In listing patents in the Orange Book, the FDA acts in a ministerial capacity. It does not verify whether the patents listed in the Orange Book are properly listed but instead relies on the accuracy and truthfulness of the NDA applicant.

63.     In addition to the protection conferred by patents covering the brand manufacturer's drug, NDA applicants are afforded additional statutory protections for a drug containing a new active ingredient. NDAs for drugs containing a new active ingredient are given up to five years of marketing exclusivity before any generic drug manufacturer may file an application for the approval of a generic formulation.[20]

---

[18] 21 U.S.C. § 355(j)(7)(A)(iii).
[19] 21 C.F.R. § 314.53(b).
[20] 21 U.S.C. § 355(j)(5)(F)(ii).

B.    **The Hatch-Waxman Act Encourages and Facilitates Generic Drug Approvals**

64.    In 1984, Congress amended the FDCA with the enactment of the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984), more commonly known as the "Hatch-Waxman Act."

65.    The Hatch-Waxman Act simplifies the regulatory hurdles that generic drug manufacturers have to clear prior to marketing and selling generic drugs. Instead of filing a lengthy and highly costly NDA, the Hatch-Waxman Act allows generic drug manufacturers to obtain FDA approval in an expedited fashion through the filing of an ANDA.

66.    If an ANDA applicant shows that the generic drug is bioequivalent to the brand drug, then the ANDA applicant may rely on scientific and other data compiled in the brand drug NDA it references concerning, among other things, safety and efficacy.[21] The ability to rely on the scientific data published in the referenced NDA obviates the need for duplicative and expensive experimentation and clinical trials, which in some instances can result in out-of-pocket costs of upwards of $130 million. The FDA must approve an ANDA unless the information submitted in the ANDA is insufficient to meet the requirements under the Hatch-Waxman Act.[22] In sum, the streamlined approval process under the Hatch-Waxman Act makes it easier for generic drug manufacturers to bring competing and less-expensive generic products to market.

67.    Although the Hatch-Waxman Act seeks to facilitate generic competition, the brand manufacturer retains the right to enforce any patents associated with its brand drug. As part of its ANDA, the applicant must certify that the generic drug will not infringe any of the Orange Book patents because: (1) no patents exist on the brand drug; (2) the patents have

---

[21] 21 U.S.C. § 355(j)(2)(A).
[22] 21 U.S.C. § 355(j)(4).

expired; (3) the patents will expire by the time the generic product comes to market; or (4) the patents are invalid, unenforceable, or will not be infringed by the sale of the generic product.[23] When a generic drug manufacturer certifies that the patents covering the referenced brand drug are invalid, unenforceable, or will not be infringed, it known as a "Paragraph IV certification."

68.    When a generic drug manufacturer files a Paragraph IV certification asserting that one or more patents listed in the Orange Book are invalid, unenforceable or will not be infringed, it must serve notice of its certification to both the brand manufacturer and the owner(s) of the patent.

69.    The issuance of a Paragraph IV certification creates an "artificial act" of patent infringement, permitting the patent owner to file a patent infringement suit against the ANDA applicant making the Paragraph IV certification(s).[24]

70.    If the brand manufacturer files a patent infringement suit against the ANDA applicant within 45 days of receiving the Paragraph IV certification, the FDA may not grant final approval to the ANDA until the earlier of: (a) 30 months, running from the date the when the Paragraph IV notice was served on the patentee; or (b) a court ruling that the patent is invalid, unenforceable, or not infringed by the ANDA.[25] During the 30-month stay, the FDA may grant "tentative approval" of an ANDA if the FDA determines that the ANDA would otherwise qualify for final approval but for the 30-month stay.

71.    Despite the threat of a patent infringement suit and a 30-month stay, the Hatch-Waxman Act creates powerful incentives for generic drug manufacturers to file ANDAs. Specifically, the Hatch-Waxman Act grants a 180-day period of market exclusivity to the first

---

[23] 21 U.S.C. § 335(j)(2)(A)(vii)(I)–(IV).
[24] 35 U.S.C. § 271(e)(2)(A).
[25] 21 U.S.C. § 355(j)(5)(B)(iii).

applicant (the "first filer") to file a substantially complete ANDA containing a Paragraph IV certification.

72.    During the 180-day period of market exclusivity, the first filer only competes against the brand manufacturer and potentially any AG marketed under the brand manufacturer's NDA; all other generic ANDA applicants must wait until either the expiration of the 180-day exclusivity period or a court order finding that each of the patents that are the subject of a Paragraph IV certification are invalid, unenforceable, or not infringed.

73.    Because all other ANDA generics are barred from the market during the first filer's 180-day exclusivity period, the first-filing ANDA applicant is able to price its generic version at a price that is around 20%-30% below the brand drug's price. This allows the first filer to gain market share, while simultaneously taking advantage of the price umbrella created by the brand manufacturer's pricing. Indeed, during the first-filer's 180-day exclusivity period, the first-filer can capture over 80% of branded and generic unit and dollar sales.

74.    However, once the first filer's 180-day exclusivity period expires, all other FDA-approved ANDA filers can begin to market their generic equivalents, driving down prices substantially and reducing the profitability of both the branded drug and the first filer's generic.

**C.    Brand Manufacturers and First Filers Can Manipulate the Regulatory Structure to Delay the Emergence of Generic Competition**

75.    Because the Hatch-Waxman Act automatically stays the approval of an ANDA when a brand manufacturer files an infringement suit against an ANDA applicant, brand manufacturers have an incentive to liberally (and sometimes wrongfully) list in the Orange Book all patents potentially covering the brand drug. Upon a generic drug manufacturer's filing of an ANDA with a Paragraph IV certification, the brand manufacturer will then sue on one or more of those Orange Book patents to trigger the stay.

76.     Frequently, patent infringement suits arising from Paragraph IV certifications result in settlements. In some of these settlements, the brand manufacturer will offer the generic drug manufacturer some form of consideration (i.e., payment) in exchange for the generic drug manufacturer agreeing to delay entry of its generic product. These settlements commonly are referred to as "pay-for-delay" or "reverse payment" agreements.

77.     These pay-for-delay agreements have the practical effect of permitting the settling brand manufacturer to retain a significant portion of its monopoly profits while only ceding a relatively small portion of those profits to the settling generic drug manufacturer in exchange for the generic drug manufacturer's agreement to delay market entry.

78.     The incentive to create these types of agreements is particularly acute between a brand manufacturer and the first-filing ANDA applicant. In these agreements, the brand manufacturer seeks to delay generic entry and preserve its monopoly for as long as possible. Typically, a generic drug manufacturer will want as early an entry date as possible, if only for the higher present value of earlier sales.

79.     However, unlike other generic drug manufacturers, a first-filing ANDA applicant has the potential benefit of 180 days of marketing exclusivity where it can reap substantial revenues as potentially one of two products in the relevant drug market. A first-filing ANDA applicant's continued litigation against the brand manufacturer runs the risk that the court will find the patent(s) at issue valid, enforceable, and/or infringed by the first filer's ANDA. A finding of validity, enforceability, and/or infringement by a court would negate the first filer's Paragraph IV certification and disqualify that generic drug manufacturer from receiving the benefit of 180 days of marketing exclusivity. Thus, the first filer has an acute interest in settling

the patent infringement lawsuit as a means of guaranteeing its 180-day exclusivity period, and, in turn, the economic bounty associated with it.

80.     With the promise of substantial revenue during its generic exclusivity period secure, the first filer cares little about date of ultimate launch sought by the brand manufacturer—that is so long as the brand name manufacturer sufficiently compensates the first filer for the delay in launching its generic.

81.     Moreover, brand manufacturers are willing to pay substantial sums to the first filer for any delay in generic launch in exchange for the promise that the first filer will not enter before a certain date. This is because the value of monopoly profits is so great that the brand manufacturer is willing to pay more to ensure the first filer's acquiescence to the later launch date. The generic drug manufacturer's acquiescence to a later entry date, in turn, preserves a substantial portion of the brand manufacturer's monopoly profits in the period prior to the first filer's agreed-to launch date.

82.     In essence, by settling with the brand manufacturer, the first filer receives a double bonus in the form of: (1) a substantial payment from the brand manufacturer to forgo early entry; and (2) the guarantee of substantial revenues as the only generic on the market (absent an authorized generic) during that first filer's 180-day exclusivity period. Under such circumstances, the first-filing ANDA applicant has limited incentive to continue the patent litigation for purposes of securing a judgment of non-infringement, invalidity, or unenforceability—and thus, a potentially earlier entry date—because it still retains the economic bounty associated with its statutory 180-day exclusivity period.

83.     Such pay-for-delay agreements also create powerful disincentives for subsequent ANDA filers to continue defending their ANDAs in patent infringement litigations against the

brand manufacturer. Specifically, once it becomes apparent that the brand manufacturer and the first filer have settled their patent litigation, subsequent ANDA filers usually will not pursue litigation aggressively, and, oftentimes, settle as well.

84.    This is especially true if there are Contingent Launch Provisions ("CLPs"), a/k/a "acceleration" clauses, in the patent settlements. CLPs can be anticompetitive because they dilute the incentive of other generic rivals to aggressively challenge otherwise weak patents. The Chairman and CEO of Apotex, Inc.—one of the largest generic manufacturers in the world— testified before Congress that acceleration provisions "eliminate any incentive for a subsequent filer to continue to litigate for earlier market entry."[26] CLPs deter others from entering earlier and cause the first filer to accept a later entry date:

> [N]o subsequent filer is going to take up the patent fight knowing it will get nothing if it wins. *Consumers are the biggest losers under this system.* If subsequent filers do not have the incentive to take on the cost of multimillion patent challenges these challenges will not occur. Weak patents that should be knocked out will remain in place, unduly blocking consumer access to generics. The challenges to brand patents by generic companies that Hatch-Waxman was designed to generate will decrease. And settlements that delay consumer access to the generic will, in turn, increase.[27]

85.    CLPs are common enough in patent settlements that when one generic company sees that a generic rival has settled its patent litigation with the brand, it is reasonable for the still-litigating generic to suspect that the settlement included an acceleration provision. The still-litigating generic must then weigh that probability against the value of continuing with its patent challenge. If the settling generic received an acceleration provision, the litigating generic knows

---

[26] Statement of Bernard Sherman, CEO, Apotex, Inc., http://www.gpo.gov/fdsys/pkg/CHRG-111hhrg67822/pdf/CHRG-111hhrg67822.pdf, at 228 (May 7, 2007).

[27] Statement of Bernard Sherman, CEO, Apotex, Inc., *available at* http://www.gpo.gov/fdsys/pkg/CHRG-111hhrg67822/pdf/CHRG-111hhrg67822.pdf, at 218 (March 31, 2009).

that it even if it wins its patent litigation, it must share the fruits of its success—*i.e.*, market entry and generic sales—with the settling generic.

86.    Worse still, if the settling generic has first-filer exclusivity, the successful generic in litigation would be sidelined for 180 days, while the first filer's entry date is "accelerated," permitting it to reap the bounty of its 180-day exclusivity. Thus, the mere possibility that a settling generic could have a CLP significantly reduces the incentive for other generic challengers to pursue their patent litigations. The presence of a CLP can also induce the still-litigating generic to settle with the brand on terms that are no better than the previously settling generic—thereby doing nothing to tamp the anticompetitive effects of the prior settlement.

## FACTUAL ALLEGATIONS

### A.    Bystolic

87.    The FDA approved Bystolic in December 2007. Bystolic is available in four dosage strengths (2.5, 5, 10, and 20 mg) and is indicated for the treatment of hypertension.

88.    Janssen Pharmaceutica ("Janssen") originally held the rights to Bystolic. In 2001, Janssen entered into a license agreement with Mylan Pharmaceuticals ("Mylan") for the rights to Bystolic in the United States and Canada. Mylan obtained consent to further sublicense Bystolic to Forest as part of a January 2006 commercialization and development deal.

89.    In March 2012, Forest acquired all intellectual property rights to Bystolic from Janssen for a one-time cash payment of $357 million. Forest was, and its successor in interest Allergan is, the holder of NDA No. 21-742 for Bystolic.

### B.    Basic Chemistry Relating to the Active Pharmaceutical Ingredient in Bystolic

90.    Molecules are composed of atoms (e.g., carbon, nitrogen or hydrogen) that are bonded to each other through the sharing of electrons. The atom carbon forms four bonds and tends to adopt a tetrahedral structure. That three-dimensional arrangement can be envisioned as a

tetrahedron with the carbon atom at the center and the four substituents at the four vertices of the tetrahedron.

91.    The chemical symbol for a carbon atom is "C." The figure below depicts a carbon atom (labeled as "C") bonded to four different chemical substituents (labeled as "X1," "X2," "X3," and "X4"). The straight lines from the carbon atom (at the center) to "X1" and "X4" are



intended to convey that they are in the plane of the page. The solid wedge from the carbon atom to "X3" is intended to convey that it is coming out of the page towards the reader. And the hashed wedge from the carbon atom to "X2" is intended to convey that it is coming out of the page but away from the reader. Thus, the above figure reflects a three-dimensional tetrahedral structure with a carbon atom at its center.

92.    When a carbon atom is attached to four different substituents in a tetrahedral arrangement such as that shown above, the substituents can be arranged in either of two conformations, as depicted below, with a mirror line between them.



93.    A carbon atom bonded to four different substituents can thus exist as either of two "stereoisomers" and such a carbon atom is referred to as a "chiral center." Naming conventions exist to distinguish these two stereoisomers from one another, and a commonly used terminology refers to one configuration as the "R" configuration and the other as the "S" configuration.

94.    Distinguishing between stereoisomers can be particularly important in biological systems because many active pharmaceutical ingredients ("APIs") in drugs interact with naturally occurring receptors in the human body by fitting into a three-dimensional site on the receptor, much like a left hand fits into a left-handed glove. Just as a left hand would not fit properly into a right- handed glove, the wrong stereoisomer often will not fit into the intended receptor site. Thus, it is not uncommon for one stereoisomer to exhibit a desired pharmacological activity in biological systems while the other does not.

95.    Carbon is so ubiquitous in organic chemicals that a carbon atom in chemical structures is often abbreviated as a vertex, rather than as a "C," with the understanding that such vertices are carbon. The chemical symbol for hydrogen is "H" and hydrogen only forms one bond. Because hydrogen is also ubiquitous and the number of chemical bonds that carbon and hydrogen make (i.e., 4 and 1, respectively) is so well known, hydrogen is often omitted from

chemical structures and its presence is assumed when a carbon atom has less than four bonded substituents.

96.    On March 31, 1987, the U.S. Patent and Trademark Office ("PTO") issued U.S. Patent No. 4,654,362 ("the '362 Patent"). The '362 Patent disclosed a number of different chemical compounds, including the following chemical compound:



97.    The unlabeled vertices above correspond to a carbon atom and each of those carbon atoms (vertices) is connected to other atoms. To the extent a particular carbon atom has less than four bonds depicted, the remainder are hydrogen atoms. With this understanding in mind, each asterisk in the above chemical structure corresponds to a chiral center—i.e., a carbon atom bonded to four different substituents—that can adopt either of two configurations that can be labeled as either an "R" or "S" configuration. As a result, the above chemical structure discloses ten different possible stereoisomers with the following configurations:

1. SRRR        6. SRSS

2. RSSS        7. RSRR

3. SRRS        8. RRSS

4. RSSR        9. SSSS

5. SRSR        10. RRRR

98.    The active ingredient in Bystolic is a mixture of two of the above ten stereoisomers: the SRRR and RSSS stereoisomers (i.e., nos. 1 and 2, above). The mixture of

these two stereoisomers is referred to as nebivolol, and both are present in Bystolic as a hydrochloride salt.

### C.    Forest's Bystolic Patents

99.    Forest certified to FDA that the '040 and '580 Patents covered Bystolic, and FDA listed those patents in the Orange Book. The '580 Patent issued on June 2, 1998 and expired seventeen years later, on June 2, 2015. Accordingly, the '580 Patent afforded Forest no protection from generic competition for Bystolic beyond June 2, 2015.

100.    The '040 Patent issued from U.S. Application Serial No. 07/825,488 ("the '488 Application") filed on January 24, 1992. To understand the impact of prosecution of the '488 Application at the PTO on the scope of the issued claims in the '040 Patent, it is important to understand the effect of the choice of transition in a patent claim. "A patent claim typically has three parts: the preamble, the transition, and the body."[28] "The preamble is an introductory phrase that may summarize the invention, its relation to the prior art, or its intended use or properties."[29] "The transition is a phrase connecting the preamble to the body of the claim. The content of the phrase may indicate whether the elements stated in the body are 'open' or 'closed.'"[30] "The body of the claim is the recitation or listing of the elements and limitations which define the product or process to be encompassed within the patent monopoly."[31]

101.    There are three commonly used transitional phrases: "comprising," "consisting of," and "consisting essentially of."[32] These are "terms of art in patent law that 'define the scope of the claim with respect to what unrecited additional components or steps, if any, are excluded

---

[28] Donald S. Chisum, CHISUM ON PATENTS § 8.06[1](b) (2003).

[29] *Id.* § 8.06[1](b)[i].

[30] *Id.* § 8.06[1](b)[ii].

[31] *Id.* § 8.06[1](b)[iii].

[32] *Id.* § 8.06[1](b)[ii]; *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1360 (Fed. Cir. 2006).

from the scope of the claim.'"[33] At one end of the spectrum, the phrase "comprising" signifies that the claim is "open" to the addition of unrecited components or steps.[34] For example, a claim reciting a product "comprising" three ingredients A, B, and C encompasses a product composed of A, B, C and D (i.e., the addition of D to the A-B-C combination does not avoid infringement).

102.    The originally-filed claims in the application that issued as the '040 Patent employed the open transition "comprising." For example, originally-filed claim 19 covered pharmaceutical compositions "comprising" a "pharmaceutically acceptable carrier" and the SRRR and RSSS stereoisomers of nebivolol. The use of the open transition "comprising" meant that original claim 19 covered formulations having the SRRR and RSSS stereoisomers of nebivolol, even if the formulations also included some or all of the other eight unclaimed stereoisomers of nebivolol. The PTO examiner therefore rejected those claims based upon the prior art '362 Patent described above. The examiner reasoned that the '362 Patent taught mixtures of various of the stereoisomers described above and thus were covered by pending claim 19.

103.    In response, the applicants admitted that the '362 Patent taught "undefined mixtures that may include the presently claimed compounds in admixture with other stereoisomers of the Base Compound. . . ."[35] More specifically, the applicants admitted that "Compound 84 . . . is an underlined mixture of the RSRR, RSSS, SRSS and SRRR isomers, and Compound 87 . . . is an underlined mixture of the RSRS, RSSR, and SRRS isomers."[36] In an attempt to overcome the rejection, the applicants narrowed the claims by substituting new claims

---

[33] *Id.* (quoting the Manual of Patent Examining Procedures).

[34] *CIAS, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007).

[35] Aug. 31, 1992 Patent Amendment at 4.

[36] *Id.* at 8 (underline in original).

utilizing the transition "consisting essentially of" rather than "comprising."[37] In doing so, the applicants emphasized that the purpose of the amendment was to distinguish their claims from the undefined mixtures of other nebivolol isomers disclosed in the prior art '362 Patent:

> Claims 18 and 19 have been rewritten as new Claims 25 and 26. Claim 25 recites "A composition consisting essentially of the compound . . .", and Claim 26 recites "A pharmaceutical composition consisting essentially of . . . [the two compounds (a) and (b)]". This amendment is being made to more clearly distinguish the claimed invention over the prior art ['362 Patent] which, as is explained in detail below, discloses undefined mixtures that may include the presently claimed compounds in admixture with other stereoisomers of [nebivolol]. Favorable consideration of the amended claims is respectfully requested.[38]

104.    The transition "consisting essentially of" in a patent claim narrows the claim relative to "comprising."[39] "[W]ith respect to a 'consisting essentially of' claim, there is no infringement where the accused product contains additional, unclaimed ingredients that materially affect the basic and novel properties of the invention."[40] Thus, for a claim reciting a product "consisting essentially of" ingredients A, B and C, the addition of unrecited ingredient D will avoid infringement if D has a material effect on the basic and novel properties of the claimed invention.

105.    The PTO examiner, however, was not persuaded that the use of the "consisting essentially of" transition distinguished the then-pending claims from the '362 Patent. He therefore maintained his rejection of the claims. The applicants for the '040 Patent again argued that it was impossible to tell from the '362 Patent which stereoisomers, and in what amounts, were definitely present in the disclosed mixtures:

---

[37] *Id.* at 2.

[38] *Id.* at 3.

[39] *AK Steel Corp. v. Sollac and Ugine*, 344 F.3d 1234, 1239 (Fed. Cir. 2003).

[40] *Yoon Ja Kim v. Conagra Foods, Inc.*, 465 F.3d 1312, 1320-21 (Fed. Cir. 2006).

> There is no way that one can determine from the teachings of the patent the specific stereoisomeric configuration of [the prior art '362 Patent's] compound Nos. 84 and 87.[41]

The Examiner continued to maintain his rejections and ultimately issued a final rejection of the "consisting essentially of" Claims 25 and 26, as anticipated by the '362 Patent. He also rejected the claims as obvious.

106.    The applicants for the '040 Patent appealed the examiner's final anticipation and obviousness rejections to the Board of Patent Appeals and Interferences ("the Board"). In their brief, the applicants continued to argue that it was impossible to say exactly which stereoisomers (and how much of them) were present in Compound 84 of the prior art '362 Patent but that the "possible" stereoisomers present in unknown amounts were RSRR, RSSS, SRRR and SRSS. During the course of briefing the appeal to the Board, the Examiner dropped the anticipation rejection.

107.    The Board nevertheless addressed the anticipation issue and made certain findings and conclusions regarding the relationship between then-pending Claim 26 and Compound 84 of the '362 Patent. Specifically, the Board concluded:

> [The '362 Patent's] disclosure of compound 84, together with its designation "AB," appears to describe the individual RSSS, SRRR, RSRR and SRSS stereoisomers "just as surely as if they were identified in the reference by name."[42]

108.    The Board then determined that the "consisting essentially of" transition in then-pending Claim 26 caused the claim to cover the undefined mixture of isomers in the Prior Art '362 Patent:

> It is well settled that "the phrase 'consisting essentially of' limits the scope of a claim to the specified ingredients and those that do

---

[41] Aug. 31, 1992 Patent Amendment at 7-8.

[42] *Ex parte Xhonneux & Van Lommen*, No. 1996-2910, Paper No. 39, at 7 (PTAB Jan. 13, 2000).

not materially affect the basic and novel characteristic(s) of a composition." Here, a basic and novel characteristic of the pharmaceutical composition of claim 26 is its blood pressure reducing or antihypertensive effect. Thus, claim 26 is open to ingredients that do not materially affect its antihypertensive activity. [The prior art '362 Patent's] antihypertensive compound 84 is a mixture of four stereoisomers: RSSS, SRRR, RSRR and SRSS. ***Because the RSSR and SRSS stereoisomers do not materially affect blood pressure reducing or antihypertensive activity, it appears that they are not excluded from the composition of claim 26.***[43]

(internal citation omitted and emphasis added). Accordingly, the Board ordered the Examiner to reconsider his withdrawal of the anticipation rejection based on the Prior Art '362 Patent:

> Specifically, the examiner should consider whether claim 26 "reads on" [the '362 Patent's] compound 84 taking into account the appropriate principles of claim interpretation and the foregoing remarks.[44]

The very clear upshot of the Board's decision was that the claims of the '488 Application were not patentable unless the claims excluded the unclaimed stereoisomers, particularly the RSSR and SRSS stereoisomers.

109.    On remand from the Board, the applicants for the '040 Patent did not even attempt to argue against anticipation in view of the Board's opinion. Instead, they further narrowed their claims by replacing "consisting essentially of" with "consisting of," in new Claims 27 and 28. And based on that change, applicants argued that the new "consisting of" limitation excluded the undefined mixture of possible stereoisomers in the '362 Patent:

> Applicants respectfully submit that the claims, as amended, are patentable over [the prior art '362 Patent].
>
> Applicants submit that neither a composition consisting of the RSSS enantiomer, nor a composition consisting of the RSSS enantiomer and its enantiomer the SRRR enantiomer, are disclosed

---

[43] *Id.* at 9.

[44] *Id.*.

34

in [the '362 Patent]. [The '362 Patent] discloses the base compound, as an undefined mixture of stereoisomers, as compound 84 (designated as "AB") and 87 (designated as "AA"), shown in the table in Col. 21 of the patent.[45]

110.    Once again, the applicants expressly noted that "Compound 84 [of the prior art '362 Patent] is an undefined mixture of the RSRR, RSSS, SRSS and SRRR isomers, and Compound 87 [] is an undefined mixture of the RSRS, RSSR, and SRRS isomers."[46] They argued that the new "consisting of" language excluded compounds containing such additional isomers:

[I]t is clear that the cited ['362 Patent] discloses neither a composition consisting of the RSSS enantiomer of the base compound, nor a composition consisting of the RSSS and SRRR enantiomers.[47]

111.    And again, applicants did not distinguish their claims based on any particular amount or source of possible unrecited stereoisomers in the "undefined mixture" of the '362 Patent.

112.    The phrase "consisting of" is the narrowest of the transitions and it "signifies restriction and exclusion of unrecited steps or components."[48] In light of the Board's reasoning and the applicants' comments and amendments, it is clear that the narrowing amendment was intended to and did exclude the presence of the unclaimed stereoisomers, particularly the RSSR and SRSS stereoisomers (i.e., the claims do not cover formulations containing the unclaimed stereoisomers, especially the RSSR and SRSS stereoisomers).

---

[45] July 20, 2001 Patent Amendment at 7.

[46] *Id.* at 8.

[47] *Id.*.

[48] Manual of Patent Examining Procedures § 2111.03; *Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1331 (Fed. Cir. 2004).

113.    The Examiner then allowed the "consisting of" Claims 27 and 28, which ultimately issued as Claims 2 and 3 of the '040 Patent in 2003.

114.    Subsequently, the '040 Patent was subjected to reexamination proceedings, and a reexamination certificate issued in 2009.

**D.    The Generic Competitors File ANDAs for Generic Versions of Bystolic**

115.    Alkem, Amerigen, Glenmark, Indchemie, Hetero, Torrent and Watson were the first generic manufacturers to submit ANDAs containing Paragraph IV certifications regarding Bystolic patents. For example, in letters granting final approval to their ANDAs, the FDA noted that each was "one of the first ANDA applicants to submit a substantially complete ANDA with a paragraph IV certification for Nebivolol Tablets."[49]

116.    Because the Generic Competitors were the first companies to file substantially complete ANDAs with Paragraph IV certifications, they each stood to receive 180 days of marketing exclusivity during which the FDA would not give final approval to any later ANDA filer's generic equivalent of Bystolic.

117.    Forest received the Generic Competitors' Paragraph IV notice letters on the following dates:

|  |  |
|---|---|
| Torrent: | February 2, 2012[50] |
| Indchemie: | February 3, 2012[51] |
| Alkem: | February 3, 2012[52] |

---

[49] *See, e.g.*, 11/27/2015 Letter from FDA to Watson, https://www.accessdata.fda.gov/ drugsatfda_docs/appletter/2015/203683Orig1s000Ltr.pdf; 5/27/2017 Letter from FDA to Glenmark, https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2017/ 203821Orig1s000ltr.pdf; 6/24/2015 Letter from FDA to Alkem, https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2015/ 203741Orig1s000ltr.pdf.

[50] *Forest Laboratories, et al. v. Torrent Pharmaceuticals Ltd. et al.*, 12-cv-05030 (D. Del. Mar. 13, 2012) (ECF No. 1 ¶ 93).

[51] *Forest Laboratories, et al. v. Indchemie Health Specialties PVT et al.*, 12-cv-01855 (N.D. Ill. Mar. 14, 2012) (ECF No. 1 ¶ 22).

| | |
|---|---|
| Watson: | February 13, 2012[53] |
| Amerigen: | February 16, 2012[54] |
| Glenmark: | February 20, 2012[55] |
| Hetero: | February 17, 2012[56] |

118.    Because they contained Paragraph IV certifications, these notice letters were required to include a detailed statement of the factual and legal bases as to why the '040 Patent was invalid, unenforceable, and/or not infringed by their ANDA products. The Paragraph IV notice letters were required to include an offer of confidential access to each Generic Competitor's ANDA under the Hatch-Waxman Act. The notice letters gave rise to a potential cause of action for patent infringement, thereby allowing Forest to file suit against the Generic Competitors under the Hatch- Waxman Act (if Forest otherwise had a basis to sue under Rule 11).

**E.    The Bystolic Patent Litigation**

119.    On March 13, 2012, in response to their Paragraph IV certification letters, Forest filed a patent infringement lawsuit in the U.S. District Court for the District of Delaware against Torrent, Watson, Amerigen, Glenmark, and Hetero.[57]

---

(continued)

[52] *Id.* ¶ 38.

[53] *Forest Laboratories, et al. v. Torrent Pharmaceuticals Ltd. et al.*, 12-cv-05030 (D. Del. Mar. 13, 2012) (ECF No. 1 ¶ 108).

[54] *Id.* ¶ 123.

[55] *Id.* ¶ 138.

[56] *Id.* ¶ 153.

[57] *Forest Laboratories, et al. v. Torrent Pharmaceuticals Ltd. et al.*, 12-cv-05030 (D. Del. Mar. 13, 2012) (ECF No. 1).

120.    On March 14, 2012, in response to their Paragraph IV certification letters, Forest filed a patent infringement lawsuit in the U.S. District Court for the Northern District of Illinois against Indchemie and Alkem.[58]

121.    By order of the Judicial Panel for Multidistrict Litigation, these cases were consolidated into *In re Nebivolol Patent ('040) Litigation*, 12-cv-5026 (N.D. Ill. June 12, 2012) (ECF No. 1) (hereafter referred to as the "Nebivolol Patent Litigation").

122.    Forest could not prevail in the Nebivolol Patent Litigation. The sole independent claim asserted by Forest in the Bystolic Patent Litigation was claim 2, as shown below:

2.    A pharmaceutical composition consisting of a pharmaceutically acceptable carrier and, as active ingredients:

(a)    the blood pressure reducing compound [2S,αR, 2′R,α′R]-α,α′- [iminobismethylene]bis[6-fluoro-3,4-dihydro-2H-1-benzopyran-2-methanol] having the formula:



or a pharmaceutically acceptable acid addition salt thereof; and

(b)    the compound [2R,αS,2′S,α′S]-α,α′-[iminobismethylene]bis[6-fluoro-3,4- dihydro-2H-1-benzopyran-2-methanol] having the formula:



---

[58] *Forest Laboratories, et al. v. Indchemie Health Specialties PVT et al.*, 12-cv-01855 (N.D. Ill. Mar. 14, 2012) (ECF No. 1).

or a pharmaceutically acceptable acid addition salt thereof.[59]
Thus, claim 2 is limited to a pharmaceutical composition consisting of a pharmaceutically
acceptable carrier and, as active ingredients, SRRR-nebivolol and RSSS-nebivolol (or
pharmaceutically acceptable acid addition salts).

123.    The Generic Competitors were well aware of the prosecution history of the '040
Patent and the narrowing amendments the applicants had made. During claim construction
proceedings in the *Nebivolol Patent Litigation*, they correctly argued that the term "consisting
of" in claim 2 of the '040 Patent "excludes any unrecited stereoisomers of nebivolol." The
Generic Competitors' products did not infringe because they included at least small amounts of
the unrecited stereoisomers of nebivolol, including the RSSR and SRSS stereoisomers.

124.    Early on in the Bystolic Patent Litigation, the Generic Competitors argued that the
"consisting of" transition precluded the use of a plurality of inactive ingredients. Their position
was premised on the argument that (1) a "pharmaceutically acceptable carrier" referred to an
individual inactive ingredient in a pharmaceutical formulation; (2) the "consisting of" transition
"closed" the claim to unrecited inactive ingredients; and (3) therefore, the claims did not cover
formulations having two or more inactive ingredients. At least one other court has construed
"pharmaceutically acceptable carrier" to mean "a conventional pharmaceutically acceptable
excipient or additive. . . ."[60] To the extent this interpretation applied in the *Nebivolol Patent
Litigation*, the Generic Competitors' products did not infringe for this additional reason.

125.    As a result of the foregoing, Forest could not prevail in proving literal
infringement of the asserted claims of the '040 Patent. And, in light of the prosecution history of

---

[59] '040 Patent at 11:33-12:22.
[60] *Schering Corp. v. Mylan Pharms., Inc.*, 2011 U.S. Dist. LEXIS 63825, at *36 (D.N.J. Jun. 15, 2011).

the '040 Patent, Forest could not prevail based on the doctrine of equivalents. In addition,

Forest's invalidity defenses concerning the asserted claims of the '040 Patent were weak, and it

could not have prevailed against the Generic Competitors' invalidity arguments. As the Board

explained during the prosecution of the '040 Patent:

> [The '362 Patent's] disclosure of compound 84, together with its
> designation "AB," appears to describe the individual RSSS, SRRR,
> RSRR and SRSS stereoisomers "just as surely as if they were
> identified in the reference by name."[61]

The '362 Patent was prior art to the '040 Patent. In light of the '362 Patent's essentially explicit

teaching of a mixture of "the individual RSSS, SRRR, RSRR and SRSS stereoisomers" of

nebivolol, the asserted compositions in the '040 Patent were anticipated by, or obvious in view

of, the prior art, including other pertinent prior art such as Van de Water, *et al.*, *Pharmacological*

*and Hemodynamic Profile of Nebivolol, a Chemically Novel, Potent, and Selective B1-*

*Adrenergic Antagonist*, Journal of Cardiovascular Pharmacology, 11, No. 5, 552-563 (1988).

Any purported evidence of secondary indicia of non-obviousness was insufficient to overcome

the clear prima facie obviousness of the claims.

### F.    Forest Enters into Unlawful Pay-for-Delay Agreements with the Generic Competitors

126.    Starting on October 24, 2012, Forest began entering into settlements with Generic

Competitors to resolve the Nebivolol Patent Litigation. As shown in the email below, Forest's

internal and external counsel have conceded that each of these settlements also included "side-

deals":

---

[61] *Ex parte Xhonneux & Van Lommen*, No. 1996-2910, Paper No. 39, at 7 (PTAB Jan. 13, 2000).

```
To:        'Malester, Ann'[]; Newborn, Steven[steven.newborn@weil.com]
From:      Agovino, Eric 15-cv-07488-CM-RWL   Document 680-44   Filed 03/07/19   Page 332 of 419
Sent:      Tue 3/4/2014 7:47:28 PM
Importance:        Normal
Subject:   RE: Namenda settlements
Received:          Tue 3/4/2014 7:47:00 PM
EXECUTED Forest-Hetero Settlement and License Agreement.pdf
EXECUTED Term Sheet (Hetero).pdf


We entered into settlement agreements with the following defendants:

 1) Hetero

 2) Torrent

 3) Alkem

 4) Indchemie

 5) Glenmark

 6) Amerigen

 7) Actavis

 All had side deals (one side was struck with Alkem, which is a related company with Indchemie).

 Attached are the Hetero agreements.


From:Malester, Ann [mailto:Ann.Malester@weil.com]
Sent: Tuesday, March 04, 2014 9:15 AM
To: Agovino, Eric; Newborn, Steven
Subject: RE: Namenda settlements

 Eric,

 Before we engage in any discussions with the FTC on the Namenda agreements, we think it would be prudent for us to
 review all of the Bystolic settlement and licensing agreements as well as the side agreements with those generic
 companies. Could you put together the same type of information for Bystolic as you sent us for Namenda?

 Thanks so much, Ann
```

127.    These side-deals were also listed in Forest's Merger Agreement with Actavis, as

"material contracts" that "***involve payments . . . of consideration in excess of $15,000,000***."[62] In

addition, Forest has also admitted that it reimbursed "certain of the Settling Defendants' legal

costs in connection with the patent litigation."[63] Accordingly, Forest paid each Generic

Competitor at least $15 million, but likely more, in reverse payments to resolve the Nebivolol

Patent Litigation and induce the Generic Competitors to quit the patent fight.

---

[62] *In re Namenda Direct Purchaser Antitrust Litig.*, 15-cv-07488 (S.D.N.Y. Mar. 7, 2019) (ECF No. 680-22 at 69) (emphasis added).

[63] Forest Laboratories, Inc., Form 10-K, at 76 (May 23, 2013), https://www.sec.gov/Archives/edgar/data/38074/000003807413000014/forest10k2013.htm.

128.    The **Hetero** reverse payments included the "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd, and Hetero USA Inc. and Hetero Labs Ltd. dated October 24, 2012," plus payment for Hetero's expended litigation costs, and a "FINAL TERM SHEET between Hetero Drugs Ltd. and Forest Laboratories Ireland Ltd. dated October 5, 2012, in connection with the settlement of BYSTOLIC patent dispute."[64]

129.    In addition to the monies Forest paid Hetero for Hetero's expended litigation costs, pursuant to the "FINAL TERM SHEET," Forest paid Hetero more than $15,000,000.

130.    The **Torrent** reverse payments included the "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Torrent Pharmaceuticals Ltd. and Torrent Pharma Inc. dated November 21, 2012," plus payment for Torrent's expended litigation costs, and a "PATENT ASSIGNMENT AGREEMENT between Torrent Pharmaceuticals Ltd and Forest Laboratories Holdings Ltd. dated November 21, 2012, in connection with the settlement of BYSTOLIC patent dispute."[65]

131.    In addition to the monies Forest paid Torrent for Torrent's expended litigation costs, pursuant to the "PATENT ASSIGNMENT AGREEMENT," Forest paid Torrent more than $15,000,000.

132.    The **Alkem** reverse payments included the "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Alkem Laboratories Ltd. dated November 27, 2012," plus payment for Alkem's expended litigation costs, and a "TERM SHEET between Alkem Laboratories Ltd., Indchemie Health Specialties Private Ltd., and Forest Laboratories Ireland Ltd. dated November 28, 2012, in connection with

---

[64] *In re Namenda Direct Purchaser Antitrust Litig.*, 15-cv-07488 (S.D.N.Y. Mar. 7, 2019) (ECF No. 680-22 at 179).

[65] *Id.*

the settlement of BYSTOLIC patent dispute." Alkem and Forest also entered into an

"AMENDMENT NO. 1 TO SETTLEMENT AGREEMENT . . . on January 9, 2013."[66]

133.    In addition to the monies Forest paid Alkem for Alkem's expended litigation

costs, pursuant to the Alkem "TERM SHEET," Forest paid Alkem more than $15,000,000.

134.    The **Indchemie** reverse payments included the "SETTLEMENT AGREEMENT

between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Indchemie Health

Specialties Private Ltd. dated November 27, 2012," plus payment for Indchemie's expended

litigation costs, and a "TERM SHEET between Alkem Laboratories Ltd, Indchemie Health

Specialties Private Ltd, and Forest Laboratories Ireland Ltd. dated November 28, 2012, in

connection with the settlement of BYSTOLIC patent dispute."[67]

135.    In addition to the monies Forest paid Indchemie for Indchemie's expended

litigation costs, pursuant to the Indchemie "TERM SHEET," Forest paid Indchemie more than

$15,000,000.

136.    The **Glenmark** reverse payments included the "SETTLEMENT AGREEMENT

between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd, and Glenmark Generics

Inc., USA and Glenmark Generics Ltd. dated December 21, 2012," plus payment for Glenmark's

expended litigation costs, and a "COLLABORATION AND OPTION AGREEMENT between

Glenmark Pharmaceuticals S.A. and Forest Laboratories Holdings Ltd. dated December 21,

2012, in connection with the settlement of BYSTOLIC patent dispute."[68]

---

[66] *Id.*

[67] *Id.*

[68] *Id.*

137.    In addition to the monies Forest paid Glenmark for Glenmark's expended litigation costs, pursuant to the "COLLABORATION AND OPTION AGREEMENT," Forest paid Glenmark more than $15,000,000.

138.    The **Amerigen** reverse payments included the "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Amerigen Pharmaceuticals, Inc. and Amerigen Pharmaceuticals, Ltd. dated July 18, 2013," plus payment for Amerigen's expended litigation costs, and a "BINDING TERM SHEET COLLABORATION AGREEMENT between Forest Laboratories, Inc. and Amerigen Pharmaceuticals, Ltd. dated July 18, 2013, in connection with the settlement of BYSTOLIC patent dispute."[69]

139.    In addition to the monies Forest paid Amerigen for Amerigen's expended litigation costs, pursuant to the "BINDING TERM SHEET COLLABORATION AGREEMENT," Forest paid Amerigen more than $15,000,000.

140.    The **Watson** reverse payments included the "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Watson Laboratories, Inc. (NV), Watson Laboratories, Inc. (DE), Watson Laboratories, Inc. (NY), Watson Laboratories, Inc. (CT), Watson Pharma, Inc., and Actavis, Inc. dated November 6, 2013," plus payment for Watson expended litigation costs, and "(a) the LETTER from Forest Laboratories, Inc. to Moksha8, Inc. dated November 1, 2013 and (b) TERMINATION AND RELEASE AGREEMENT between [Watson] and Moksha8, Inc. dated November 4, 2013, in connection with the settlement of BYSTOLIC patent dispute."[70]

---

[69] *Id.* at 180.

[70] *Id.*

141.    In addition to the monies Forest paid Watson for Watson's expended litigation costs, pursuant to the "(a) the LETTER from Forest Laboratories, Inc. to Moksha8, Inc. dated November 1, 2013 and (b) TERMINATION AND RELEASE AGREEMENT between [Watson] and Moksha8, Inc.," Forest paid Watson more than $15,000,000.

142.    The value of each reverse payment exceeded Forest's avoided litigation costs.

143.    In exchange for these reverse payments, each Generic Competitor agreed not to compete with Forest in the market for Nebivolol HCl, in which Forest had a monopoly, for so long as all others did so also, until September 17, 2021 (a mere three months prior to expiry of the '040 Patent).[71]

144.    The purpose and effect of the pay-for-delay agreements were to delay the entry of lower-priced generic competition for several years.

145.    But for the pay-for-delay agreements, the Generic Competitors would have been ready, able, and willing to launch their generic versions of Bystolic much earlier.

146.    Specifically, the Generic Competitors would have launched by the later of: (a) June 2015, which was the expiry of the only other patent that Forest contended covered Bystolic (the '580 Patent) or (b) the date their ANDAs were finally approved.[72]

147.    By operation of the CLPs, if just one Generic Competitor launched a generic version of Bystolic prior to September 17, 2021 pursuant to any of the three above scenarios, all of the other Generic Competitors would have entered the market.

148.    By about October 2012, when Forest and the Generic Competitors began entering into the pay-for-delay agreements, Bystolic was generating hundreds of millions of dollars per

---

[71] Forest Laboratories, Inc., Form 10-K, at 76 (May 23, 2013), https://www.sec.gov/Archives/edgar/data/38074/000003807413000014/forest10k2013.htm.

[72] See ¶ 6, supra.

year in revenues for Forest. Losing a substantial portion of that revenue stream in the event any of the Generic Competitors were to prevail on non-infringement or other defenses—or in the event that Forest had not induced the Generic Competitors with reverse-payments to agree to delay launching AB-rated generic Bystolic—would have drastically reduced Forest's profits. Thus, Forest had enormous incentives to avoid competition from the Generic Competitors by entering into pay-for-delay agreements.

149.    Forest's willingness to provide large payments to each Generic Competitor in exchange for a multi-year delay in competition amounted to an agreement to share with the Generic Competitors the monopoly profits from sales of branded Bystolic at supracompetitive levels.

## ANTICOMPETITIVE EFFECT

150.    The reverse-payments enabled Defendants to: (a) prevent and delay until September 17, 2021 the entry of less-expensive AB-rated generic versions of Bystolic in the United States; (b) fix, raise, maintain, or stabilize the price of Nebivolol HCl tablets; and (c) allocate to themselves 100% of the U.S. market for Nebivolol HCl tablets until September 17, 2021.

151.    But for the unlawful pay-for-delay agreements, the Generic Competitors would have begun selling a less expensive, AB-rated generic versions of Bystolic much earlier than September 17, 2021. Such sales would have occurred via market entry by any of the Generic Competitors upon a Generic Competitor litigation victory, at risk (that is, while the patent litigation remained pending), or via a licensed entry in a settlement with Forest that did not include a side-deal or any other unlawful reverse-payments from Forest to any Generic Competitor.

152.    An increasingly competitive market for Bystolic and its generic equivalents, with lower prices, would have thereafter emerged as additional AB-rated generic versions of Bystolic (including, an authorized generic version of Bystolic, which is a drug manufactured under the brand's New Drug Application and licensed or sold by the brand name manufacturer with generic trade dress) entered the market. Plaintiff and members of the Classes would have purchased AB-rated generic Bystolic had it been available.

153.    Defendants' unlawful concerted action has (a) delayed and suppressed the sale of AB-rated generic versions of Bystolic in the United States, (b) enabled Defendants to sell Nebivolol HCl tablets at artificially inflated, supracompetitive prices, and (c) caused Plaintiff and the Classes to pay supracompetitive prices for Nebivolol HCl tablets.

154.    Thus, Defendants' unlawful conduct deprived Plaintiff and the Classes of the benefits of competition that the antitrust laws were designed to ensure.

## ANTITRUST IMPACT

155.    As a result of Defendants' illegal conduct, during the class period, Plaintiff and members of the Classes purchased and/or reimbursed substantial amounts Nebivolol HCl at supracompetitive prices.

156.    Those prices were substantially greater than the prices that Plaintiff and members of the Classes would have paid absent the illegal conduct alleged herein, because: (1) the price of Bystolic was artificially inflated by Defendants' illegal conduct, (2) Plaintiff and members of the Classes were deprived of the opportunity to purchase lower-priced AB-rated generic versions of Bystolic instead of Bystolic sooner, which they would have done had they had the opportunity, and/or (3) Plaintiff and members of the Classes would have paid lower prices for AB-rated generic Bystolic than the prices they actually paid for Bystolic.

157.    Upon entering the market, generic equivalents of brand name drugs are priced below the branded drug. When multiple generic products are on the market, prices for the brand drug and its generic equivalents fall even further because of the increased competition.

158.    As a consequence, Plaintiff and members of the Classes have sustained substantial losses and damage to their business and property in the form of overcharges. The full amount of such damages will be calculated after discovery and upon proof at trial.

## EFFECTS ON INTRASTATE AND INTERSTATE COMMERCE

159.    At all material times, Defendants manufactured, promoted, distributed, and/or sold substantial amounts of Bystolic in a continuous and uninterrupted flow of commerce within and across state and throughout the United States. As a direct result of the unlawful pay-for-delay agreements, the Generic Competitors refrained from selling generic versions of Bystolic when they otherwise would have done so. During the relevant time period, in connection with the purchase and sale of Bystolic, monies as well as contracts, bills and other forms of business communication and transactions were transmitted in a continuous and uninterrupted flow within and across state lines.

160.    During the relevant time period, various devices were used to effectuate the illegal acts alleged in this Complaint, including the U.S. mail, intrastate, interstate and foreign travel, and intrastate, interstate and foreign telephone commerce. The activities of Defendants as alleged in this Complaint were within the flow of, and have substantially affected, intrastate and interstate commerce.

## MONOPOLY POWER AND MARKET DEFINITION

161.    At all relevant times, Defendants had monopoly power over Nebivolol HCl products because they had the power to maintain the price of the drug they sold as Bystolic at

supracompetitive levels without losing substantial sales to other products prescribed and/or used for the same purposes as Bystolic.

162.    "[T]he 'size of the payment from a branded drug manufacturer to a prospective generic is itself a strong indicator of power'—namely, the power to charge prices higher than the competitive level."[73] And a firm that lacks monopoly power is not "likely to pay 'large sums' to induce 'others to stay out of its market.'"[74]

163.    A small but significant, non-transitory price increase for Bystolic by Defendants would not have caused a significant loss of sales to non-Nebivolol HCl products.

164.    Bystolic does not exhibit significant, positive cross-elasticity of demand with respect to price with any non-Nebivolol HCl product. Indeed, Defendants have never lowered the price of Bystolic in response to the pricing of any non-Nebivolol HCl treatments for high blood pressure. In fact, Defendants substantially increased the price of Bystolic over the last five years.

| Bystolic Unit WAC | |
| --- | --- |
| **1/3/20** | $5.1086 |
| **1/1/19** | $4.8653 |
| **1/1/18** | $4.4432 |
| **1/1/17** | $4.0577 |
| **4/1/16** | $3.7227 |
| **10/1/15** | $3.4153 |
| **1/5/15** | $3.1477 |

[73] *Actavis*, 570 U.S. at 157 (citation omitted).
[74] *Id.*

165.    Because of its labeling, Bystolic is differentiated from all non-Nebivolol HCl products.

166.    Defendants needed to control only Nebivolol HCl, and no other products, in order to maintain the price of Bystolic profitably at supracompetitive prices. No non-Nebivolol HCl product ever rendered Defendants unable to profitably maintain or raise their prices of Bystolic without losing substantial sales.

167.    Defendants also sold Bystolic at prices well in excess of marginal costs, and in excess of the competitive price, and enjoyed high profit margins.

168.    Defendants have had, and exercised, the power to exclude and restrict competition to Nebivolol HCl.

169.    Defendants, at all relevant times, enjoyed high barriers to entry with respect to competition to the relevant product market due to patent and other regulatory protections and high costs of entry and expansion.

170.    Plaintiff alleges that the relevant product market is Nebivolol HCl tablets. During the period relevant to this case, Defendants have been able to profitably maintain the price of Nebivolol HCl well above competitive levels.

171.    The relevant geographic market is the United States and its territories.

172.    At all relevant times, Defendants' market share in the relevant market was and remains 100%.

## CLASS ACTION ALLEGATIONS

173.    Plaintiff brings this action on behalf of itself and all others similarly situated as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking relief on behalf of the following classes (the "Classes"):

**The Nationwide Injunction Class**

All persons or entities in the United States and its territories that purchased or reimbursed Nebivolol HCl tablets, beginning at least as early as June 2, 2015 until the effects of Defendants' conduct cease (the "Class Period").

**The Damages Class**

All persons or entities that purchased or reimbursed Nebivolol HCl tablets, beginning at least as early as June 2, 2015 until the effects of Defendants' conduct cease in any of the following states or territories: Arizona, California, Connecticut, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, or Wisconsin.

174.　The following persons and entities are excluded from each of the above-described proposed Classes:

(a)　Defendants and their counsel, officers, directors, management, employees, subsidiaries, or affiliates;

(b)　All governmental entities (including state and federal Medicaid programs), except for government-funded employee benefit plans;

(c)　All persons or entities who purchased Bystolic for purposes of resale or directly from Defendants or their affiliates;

(d)　Fully-insured health plans (plans that purchased insurance from another third-party payor covering 100 percent of the plan's reimbursement obligations to its members);

(e)　Flat co-payers (consumers who paid the same co-payment amount for brand and generic drugs);

(f)　Pharmacy Benefit Managers;

(g)　All Counsel of Record; and

(h)     The Court, Court personnel and any member of their immediate families.

175.    Members of the Classes are so numerous and geographically dispersed that joinder of all members of the Classes is impracticable. Plaintiff believes that there are thousands of members of the Classes widely dispersed throughout the United States. Moreover, given the costs of complex antitrust litigation, it would be uneconomic for many plaintiffs to bring individual claims and join them together. The Classes are readily identifiable from industry data and information and record maintained by pharmacy benefit managers, retail and mail-order pharmacies, and other sources.

176.    Plaintiff's claims are typical of the claims of members of the Classes. Plaintiff and members of the Classes were harmed by the same wrongful conduct by Defendants in that they paid artificially inflated prices for Bystolic and were deprived of the benefits of earlier and more robust competition from less-expensive AB-rated generic equivalents of Bystolic as a result of Defendants' wrongful conduct.

177.    Plaintiff will fairly and adequately protect and represent the interests of the members of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Classes.

178.    Plaintiff is represented by counsel with experience in the prosecution of class action antitrust litigation and with experience in class action antitrust litigation involving pharmaceutical products.

179.    Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual members of the Classes because Defendants have acted on grounds generally applicable to the Classes, making overcharge damages with respect to

the Classes as a whole appropriate. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

180.    Questions of law and fact common to the Classes include:

(a)    Whether Defendants unlawfully maintained monopoly power through all or part of their overall anticompetitive generic suppression scheme;

(b)    To the extent such justifications exist, whether there were less restrictive means of achieving them;

(c)    Whether direct proof of Defendants' monopoly power is available and, if so, whether it is sufficient to prove Defendants' monopoly power without the need to define the relevant market;

(d)    Whether Defendants' scheme, in whole or in part, has substantially affected interstate commerce;

(e)    Whether Defendants' unlawful agreement, in whole or in part, caused antitrust injury through overcharges to the business or property of Plaintiff and the members of the Classes;

(f)    Whether Defendants conspired with the Generic Competitors to delay generic competition for Bystolic;

(g)    Whether Defendants' challenged patent settlement agreements were necessary to yield some cognizable, non-pretextual procompetitive benefit;

(h)    Whether Defendants' compensation to the Generic Competitors was large and unexplained;

(i)    Whether the pay-for-delay agreement harmed competition;

(j)     Whether Defendants possessed the ability to control prices and/or exclude competition for Bystolic;

(k)     Whether Defendants' unlawful monopolistic conduct was a substantial contributing factor in causing some amount of delay of the entry of AB-rated generic Bystolic;

(l)     Determination of a reasonable estimate of the amount of delay Defendants' unlawful monopolistic conduct caused;

(m)     The quantum of overcharges paid by the Damages Class in the aggregate; and

(n)     The scope and nature of the equitable relief for the Nationwide Injunction Class.

181.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## FRAUDULENT CONCEALMENT AND CONTINUING VIOLATIONS

### A.     Defendants Fraudulently Concealed Their Anticompetitive Scheme

182.    Due to Defendants' fraudulent concealment of their unlawful conduct, Plaintiffs and members of the Classes are entitled to recover damages from the beginning of the Class Period. Plaintiffs and members of the Classes had no knowledge of Defendants' unlawful self-

concealing scheme and could not have discovered the scheme and conspiracy through the exercise of reasonable diligence.

183.    Defendants' scheme was self-concealing, and Defendants employed deceptive tactics and techniques of secrecy to avoid detection of, and to fraudulently conceal, their contract, combination, conspiracy, and scheme.

184.    Defendants did not disclose the material terms of their agreements with the Generic Competitors—including the size and value of the payments to the Generic Competitors—in public filings. The earliest Plaintiff was placed on notice of the claims in this complaint was March 2019, when the full February 2014 Forest-Allergan Agreement and Plan of Merger and related internal communications were publicly disclosed in the *In re Namenda Direct Purchaser Antitrust Litigation*, No. 15-cv-7488 (S.D.N.Y.). Publicly disclosed versions of the February 2014 Agreement and Plan of Merger, for example, did not include the Company Disclosure Letter, which identified Defendants' patent settlements with the Generic Competitors as settlement agreements each with consideration of at least $15 million (but likely more).

185.    Because of this failure to disclose, Plaintiffs and members of the Classes had no knowledge of the scheme and conspiracy prior to March 2019, when the Agreement and Plan of Merger was fully disclosed; they did not have the facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed; and if they would have had the facts or information to cause them to conduct an investigation, any such investigation would not have revealed the existence of Defendants' unlawful conspiracy.

186.    As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting Plaintiff's and the Classes' claims have been tolled.

**B.    Defendants' Continuing Violations of the Antitrust Laws**

187.    By virtue of Defendants' continued adherence to the unlawful patent settlement agreements with the Generic Competitors, Defendants have reaffirmed and perpetuated their anticompetitive scheme.

188.    Defendants continued sales of Bystolic at monopoly prices in the absence of the competition from Generic Competitors, and each such sale created a claim entitling Plaintiff and members of the Classes relief.

189.    Accordingly, Plaintiff's and the Classes' claims are timely.

## CLAIMS FOR RELIEF

## CLAIM ONE

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1 (AGREEMENT NOT TO COMPETE BETWEEN DEFENDANTS AND HETERO)

190.    Plaintiff incorporates the preceding paragraphs by reference.

191.    Defendants have engaged in an unlawful contract, combination, or conspiracy that has unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C.§ 1.

192.    Starting on or about October, 5 2012, Forest and Hetero entered into illegal contracts, combinations and conspiracies in restraint of trade under which Forest agreed to make large reverse-payments to Hetero in exchange for Hetero's agreement to delay bringing its AB-rated generic Bystolic to the market until September 17, 2021. The purpose and effect of these reverse payments was to: (a) allocate to Forest 100% of the U.S. sales of Nebivolol HCl until September 17, 2021; (b) delay the availability of AB-rated generic Bystolic in the United States, thereby protecting Bystolic from any generic competition until September 17, 2021; and (c) fix

and maintain, at supracompetitive levels, the price Plaintiff and Nationwide Injunction Class members paid for Nebivolol HCl.

193.    The reverse payments to Hetero were unlawful, large, and unjustified.

194.    The reverse payments to Hetero harmed Plaintiff and the Nationwide Injunction Class as set forth above.

195.    There is and was no legitimate, non-pretextual, procompetitive justification for the reverse-payments from Forest to Hetero that outweighs their harmful effect. Even if there were some conceivable such justification, the payments were not necessary to achieve, nor the least restrictive means of achieving, such a purpose.

196.    As a direct and proximate result of the Forest-Hetero pay-for-delay agreements in restraint of trade Plaintiff and the Nationwide Injunction Class were harmed and suffered overcharge damages. Specifically, without the reverse payments, Hetero would have launched its AB-rated generic version of Bystolic upon receiving final FDA approval, or via a lawful, separate, and independent settlement agreement whereby reasonable parties in the position of Forest and Hetero would have agreed upon earlier entry dates untainted by delay associated with the unlawful Hetero side-deal and other reverse-payments. In addition, by operation of the CLPs, any earlier license date agreed to between Hetero and Forest would also have applied to all earlier settling Generic Competitors, if any.

197.    Plaintiff and members of the Nationwide Injunction Class are entitled to equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, and other relief to ensure that the same or similar anticompetitive conduct does not reoccur in the future.

**CLAIM TWO**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1 (AGREEMENT NOT TO COMPETE BETWEEN DEFENDANTS AND TORRENT)**

198.    Plaintiff incorporates the preceding paragraphs by reference.

199.    Defendants have engaged in an unlawful contract, combination, or conspiracy that has unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

200.    Starting on or about November 21, 2012, Forest and Torrent entered into illegal contracts, combinations and conspiracies in restraint of trade under which Forest agreed to make large reverse payments to Torrent in exchange for Torrent's agreement to delay bringing its AB-rated generic Bystolic to the market until September 17, 2021. The purpose and effect of these reverse payments was to: (a) allocate to Forest 100% of the U.S. sales of Nebivolol HCl until September 17, 2021; (b) delay the availability of AB-rated generic Bystolic in the United States, thereby protecting Bystolic from any generic competition until September 17, 2021; and (c) fix and maintain, at supracompetitive levels, the price Plaintiff and Nationwide Injunction Class members paid for Nebivolol HCl.

201.    The reverse payments to Torrent were unlawful, large, and unjustified.

202.    The reverse payments to Torrent harmed Plaintiff and the Nationwide Injunction Class as set forth above.

203.    There is and was no legitimate, non-pretextual, procompetitive justification for the reverse payments from Forest to Torrent that outweighs their harmful effect. Even if there were some conceivable such justification, the payments were not necessary to achieve, nor the least restrictive means of achieving, such a purpose.

204.    As a direct and proximate result of the Forest-Torrent pay-for-delay agreements in restraint of trade, Plaintiff and the Nationwide Injunction Class were harmed and suffered overcharge damages. Specifically, without the reverse-payments, Torrent would have launched its AB-rated generic version of Bystolic upon receiving final FDA approval, or via a lawful, separate, and independent settlement agreement whereby reasonable parties in the position of Forest and Torrent would have agreed upon earlier entry dates untainted by delay associated with the unlawful Torrent side-deal and other reverse-payments. In addition, by operation of the CLPs, any earlier license date agreed to between Torrent and Forest would also have applied to all earlier settling Generic Competitors.

205.    Plaintiff and members of the Nationwide Injunction Class are entitled to equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, and other relief to ensure that the same or similar anticompetitive conduct does not reoccur in the future.

### CLAIM THREE

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1 (AGREEMENT NOT TO COMPETE BETWEEN DEFENDANTS AND ALKEM)

206.    Plaintiff incorporates the preceding paragraphs by reference.

207.    Defendants have engaged in an unlawful contract, combination, or conspiracy that has unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C.§ 1.

208.    Starting on or about November 27, 2012, Forest and Alkem entered into illegal contracts, combinations and conspiracies in restraint of trade under which Forest agreed to make large reverse payments to Alkem in exchange for Alkem's agreement to delay bringing AB-rated generic Bystolic to the market until September 17, 2021. The purpose and effect of these reverse

payments was to: (a) allocate to Forest 100% of the U.S. sales of Nebivolol HCl until September 17, 2021; (b) delay the availability of AB-rated generic Bystolic in the United States, thereby protecting Bystolic from any generic competition until September 17, 2021; and (c) fix and maintain, at supracompetitive levels, the price Plaintiff and Nationwide Injunction Class members paid for Nebivolol HCl.

209.    The reverse payments to Alkem were unlawful, large, and unjustified.

210.    The reverse payments to Alkem harmed Plaintiff and the Nationwide Injunction Class as set forth above.

211.    There is and was no legitimate, non-pretextual, procompetitive justification for the reverse payments from Forest to Alkem that outweighs their harmful effect. Even if there were some conceivable such justification, the payments were not necessary to achieve, nor the least restrictive means of achieving, such a purpose.

212.    As a direct and proximate result of the Forest-Alkem pay-for-delay agreements in restraint of trade, Plaintiff and the Nationwide Injunction Class were harmed and suffered overcharge damages. Specifically, without the reverse payments, Alkem would have launched its AB-rated generic version of Bystolic upon receiving final FDA approval, or via a lawful, separate, and independent settlement agreement whereby reasonable parties in the position of Forest and Alkem would have agreed upon earlier entry dates untainted by delay associated with the unlawful Alkem side-deal and other reverse payments. In addition, by operation of the CLPs, any earlier license date agreed to between Alkem and Forest would also have applied to all earlier settling Generic Competitors.

213.    Plaintiff and members of the Nationwide Injunction Class are entitled to equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, to correct for the

anticompetitive market effects caused by Defendants' unlawful conduct, and other relief to ensure that the same or similar anticompetitive conduct does not reoccur in the future.

## CLAIM FOUR

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1 (AGREEMENT NOT TO COMPETE BETWEEN DEFENDANTS AND INDCHEMIE)

214.    Plaintiff incorporates the preceding paragraphs by reference.

215.    Defendants have engaged in an unlawful contract, combination, or conspiracy that has unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

216.    Starting on or about November 27, 2012, Forest and Indchemie entered into illegal contracts, combinations and conspiracies in restraint of trade under which Forest agreed to make large reverse payments to Indchemie in exchange for Indchemie's agreement to delay bringing AB-rated generic Bystolic to the market until September 17, 2021. The purpose and effect of these reverse payments was to: (a) allocate to Forest 100% of the U.S. sales of Nebivolol HCl until September 17, 2021; (b) delay the availability of AB-rated generic Bystolic in the United States, thereby protecting Bystolic from any generic competition until September 17, 2021; and (c) fix and maintain, at supracompetitive levels, the price Plaintiff and Nationwide Injunction Class members paid for Nebivolol HCl.

217.    The reverse payments to Indchemie were unlawful, large, and unjustified.

218.    The reverse payments to Indchemie harmed Plaintiff and the Nationwide Injunction Class as set forth above.

219.    There is and was no legitimate, non-pretextual, procompetitive justification for the reverse-payments from Forest to Indchemie that outweighs its harmful effect. Even if there

were some conceivable such justification, the payments were not necessary to achieve, nor the least restrictive means of achieving, such a purpose.

220.    As a direct and proximate result of the Forest-Indchemie pay-for-delay agreements in restraint of trade, Plaintiff and the Nationwide Injunction Class were harmed and suffered overcharge damages. Specifically, without a reverse-payment, Indchemie would have launched its AB-rated generic version of Bystolic upon receiving final FDA approval, or via a lawful, separate, and independent settlement agreement whereby reasonable parties in the position of Forest and Indchemie would have agreed upon earlier entry dates untainted by delay associated with the unlawful Indchemie side-deal and other reverse payments. In addition, by operation of the CLPs, any earlier license date agreed to between Indchemie and Forest would also have applied to all earlier settling Generic Competitors.

221.    Plaintiff and members of the Nationwide Injunction Class are entitled to equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, and other relief to ensure that the same or similar anticompetitive conduct does not reoccur in the future.

**CLAIM FIVE**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1
(AGREEMENT NOT TO COMPETE BETWEEN DEFENDANTS AND
GLENMARK)**

222.    Plaintiff incorporates the preceding paragraphs by reference.

223.    Defendants have engaged in an unlawful contract, combination, or conspiracy that has unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

224.    Starting on or about December 21, 2012, Forest and Glenmark entered into illegal contracts, combinations and conspiracies in restraint of trade under which Forest agreed to make

large reverse payments to Glenmark in exchange for Glenmark's agreement to delay bringing AB-rated generic Bystolic to the market until September 17, 2021. The purpose and effect of these reverse payments was to: (a) allocate to Forest 100% of the U.S. sales of Nebivolol HCl until September 17, 2021; (b) delay the availability of AB-rated generic Bystolic in the United States, thereby protecting Bystolic from any generic competition until September 17, 2021; and (c) fix and maintain, at supracompetitive levels, the price Plaintiff and Nationwide Injunction Class members paid for Nebivolol HCl.

225.    The reverse payments to Glenmark were unlawful, large, and unjustified.

226.    The reverse payments to Glenmark harmed Plaintiff and the Nationwide Injunction Class as set forth above.

227.    There is and was no legitimate, non-pretextual, procompetitive justification for the reverse payments from Forest to Glenmark that outweighs its harmful effect. Even if there were some conceivable such justification, the payments were not necessary to achieve, nor the least restrictive means of achieving, such a purpose.

228.    As a direct and proximate result of the Forest-Glenmark reverse- payment agreements in restraint of trade, Plaintiff and the Nationwide Injunction Class were harmed and suffered overcharge damages. Specifically, without the reverse payments, Glenmark would have launched its AB-rated generic version of Bystolic upon receiving final FDA approval, or via a lawful, separate, and independent settlement agreement whereby reasonable parties in the position of Forest and Glenmark would have agreed upon earlier entry dates untainted by delay associated with the unlawful Glenmark side-deal and other reverse payments. In addition, by operation of the CLPs, any earlier license date agreed to between Glenmark and Forest would also have applied to all earlier settling Generic Competitors.

63

229.    Plaintiff and members of the Nationwide Injunction Class are entitled to equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, and other relief to ensure that the same or similar anticompetitive conduct does not reoccur in the future.

### CLAIM SIX

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1 (AGREEMENT NOT TO COMPETE BETWEEN DEFENDANTS AND AMERIGEN)

230.    Plaintiff incorporates the preceding paragraphs by reference.

231.    Defendants have engaged in an unlawful contract, combination, or conspiracy that has unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

232.    Starting on or about July 18, 2012, Forest and Amerigen entered into illegal contracts, combinations and conspiracies in restraint of trade under which Forest agreed to make large reverse payments to Amerigen in exchange for Amerigen's agreement to delay bringing AB-rated generic Bystolic to the market until September 17, 2021. The purpose and effect of these reverse payments was to: (a) allocate to Forest 100% of the U.S. sales of Nebivolol HCl until September 17, 2021; (b) delay the availability of AB-rated generic Bystolic in the United States, thereby protecting Bystolic from any generic competition until September 17, 2021; and (c) fix and maintain, at supracompetitive levels, the price Plaintiff and Nationwide Injunction Class members paid for Nebivolol HCl.

233.    The reverse payments to Amerigen were unlawful, large, and unjustified.

234.    The reverse payments to Amerigen harmed Plaintiff and the Nationwide Injunction Class as set forth above.

235.    There is and was no legitimate, non-pretextual, procompetitive justification for the reverse payments from Forest to Amerigen that outweighs its harmful effect. Even if there were some conceivable such justification, the payments were not necessary to achieve, nor the least restrictive means of achieving, such a purpose.

236.    As a direct and proximate result of the Forest-Amerigen pay-for-delay agreements in restraint of trade, Plaintiff and the Nationwide Injunction Class were harmed and suffered overcharge damages. Specifically, without the reverse payments, Amerigen would have launched its AB-rated generic version of Bystolic upon receiving final FDA approval, or via a lawful, separate, and independent settlement agreement whereby reasonable parties in the position of Forest and Amerigen would have agreed upon earlier entry dates untainted by delay associated with the unlawful Amerigen side-deal and other reverse payments. In addition, by operation of the CLPs, any earlier license date agreed to between Amerigen and Forest would also have applied to all earlier settling Generic Competitors.

237.    Plaintiff and members of the Nationwide Injunction Class are entitled to equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, and other relief to ensure that the same or similar anticompetitive conduct does not reoccur in the future.

### CLAIM SEVEN

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1 (AGREEMENT NOT TO COMPETE BETWEEN DEFENDANTS AND WATSON)

238.    Plaintiff incorporates the preceding paragraphs by reference.

239.    Defendants have engaged in an unlawful contract, combination, or conspiracy that has unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

240.    Starting on or about November 1, 2013, Forest and Watson entered into illegal contracts, combinations and conspiracies in restraint of trade under which Forest agreed to make large reverse-payments to Watson in exchange for Watson's agreement to delay bringing AB-rated generic Bystolic to the market until September 17, 2021. The purpose and effect of these reverse payments was to: (a) allocate to Forest 100% of the U.S. sales of Nebivolol HCl until September 17, 2021; (b) delay the availability of AB-rated generic Bystolic in the United States, thereby protecting Bystolic from any generic competition until September 17, 2021; and (c) fix and maintain, at supracompetitive levels, the price Plaintiff and Nationwide Injunction Class members paid for Nebivolol HCl.

241.    The reverse payments to Watson were unlawful, large, and unjustified.

242.    The reverse payments to Watson harmed Plaintiff and the Watson as set forth above.

243.    There is and was no legitimate, non-pretextual, procompetitive justification for the reverse payments from Forest to Watson that outweighs its harmful effect. Even if there were some conceivable such justification, the payments were not necessary to achieve, nor the least restrictive means of achieving, such a purpose.

244.    As a direct and proximate result of the Forest-Watson pay-for-delay agreements in restraint of trade, Plaintiff and the Nationwide Injunction Class were harmed and suffered overcharge damages. Specifically, without the reverse payments, Watson would have launched its AB-rated generic version of Bystolic upon receiving final FDA approval, or via a lawful, separate, and independent settlement agreement whereby reasonable parties in the position of Forest and Watson would have agreed upon earlier entry dates untainted by delay associated with the unlawful Watson side-deal and other reverse payments. In addition, by operation of the

CLPs, any earlier license date agreed to between Watson and Forest would also have applied to all earlier-settling Generic Competitors.

245.    Plaintiff and members of the Nationwide Injunction Class are entitled to equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, and other relief to ensure that the same or similar anticompetitive conduct does not reoccur in the future.

## CLAIM EIGHT

### VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2 (MONOPOLIZATION AND MONOPOLISTIC SCHEME)

246.    Plaintiff incorporates the preceding paragraphs by reference.

247.    At all relevant times prior to September 17, 2021, Defendants possessed substantial market power (*i.e.*, monopoly power) in the relevant market. Defendants possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

248.    By entering into the pay-for-delay agreements with the Generic Competitors, Defendants maintained, enhanced, and extended their monopoly power using restrictive or exclusionary conduct. Specifically, Defendants (a) allocated to themselves 100% of the market for Nebivolol HCl in all strengths in the United States until September 17, 2021; (b) delayed the availability of AB-rated generic versions of Bystolic in the United States, thereby protecting Bystolic from any generic competition until September 17, 2021; and (c) fixed and maintained, at supracompetitive levels, the price Plaintiff and Damages Class members paid for Nebivolol HCl.

249.    As a direct, proximate, foreseeable, and intended result of their illegal and monopolistic conduct, Defendants unlawfully maintained, enhanced, and extended their monopoly power, and Plaintiff and the Damages Class were harmed as a result.

250.    All of Forest's corporate successors, including Allergan and Forest, adopted Defendants' monopolistic scheme and took actions in furtherance of it.

251.    Plaintiff and members of the Nationwide Injunction Class are entitled to equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, and other relief to ensure that the same or similar anticompetitive conduct does not reoccur in the future.

### CLAIM NINE

### CONTRACT, COMBINATION, CONSPIRACY, OR ARRANGEMENT IN VIOLATION OF STATE ANTITRUST LAWS (AGREEMENT NOT TO COMPETE BETWEEN DEFENDANTS AND HETERO)

252.    Plaintiff incorporates the preceding paragraphs by reference.

253.    Starting on or about October, 5 2012, Forest and Hetero entered into illegal contracts, combinations, conspiracies and arrangements in restraint of trade under which Forest agreed to make large reverse-payments to Hetero in exchange for Hetero's agreement to delay bringing its AB-rated generic Bystolic to the market until September 17, 2021. The purpose and effect of these reverse payments was to: (a) allocate to Forest 100% of the U.S. sales of Nebivolol HCl until September 17, 2021; (b) delay the availability of AB-rated generic Bystolic in the United States, thereby protecting Bystolic from any generic competition until September 17, 2021; and (c) fix and maintain, at supracompetitive levels, the price Plaintiff and Damages Class members paid for Nebivolol HCl.

254.    The reverse payments to Hetero were unlawful, large, and unjustified.

255.    The reverse payments to Hetero harmed Plaintiff and the Damages Class as set forth above.

256.    There is and was no legitimate, non-pretextual, procompetitive justification for the reverse-payments from Forest to Hetero that outweighs their harmful effect. Even if there were some conceivable such justification, the payments were not necessary to achieve, nor the least restrictive means of achieving, such a purpose.

257.    As a direct and proximate result of the Forest-Hetero pay-for-delay agreements in restraint of trade Plaintiff and the Damages Class were harmed and suffered overcharge damages. Specifically, without the reverse payments, Hetero would have launched its AB-rated generic version of Bystolic upon receiving final FDA approval, or via a lawful, separate, and independent settlement agreement whereby reasonable parties in the position of Forest and Hetero would have agreed upon earlier entry dates untainted by delay associated with the unlawful Hetero side-deal and other reverse-payments. In addition, by operation of the CLPs, any earlier license date agreed to between Hetero and Forest would also have applied to all earlier settling Generic Competitors, if any.

258.    Accordingly, Defendants' anticompetitive agreement with Hetero violated the following state antitrust laws:

(a)    Ariz. Rev. Stat. §§ 44-1401, *et seq*., with respect to purchases in Arizona by the Damages Class Members;

(b)    Cal. Bus. Code §§ 16700, *et seq*., and Cal. Bus. Code §§ 17200, *et seq*., with respect to purchases in California by the Damages Class Members;

(c)    Conn. Gen. Stat. § 35-24, *et seq*., with respect to purchases in Connecticut by the Damages Class Members;

(d)      D.C. Code Ann. §§ 28-4501, *et seq.*, with respect to purchases in the

District of Columbia by the Damages Class Members;

(e)      Hawaii Code § 480, *et seq.*, with respect to purchases in Hawaii by the

Damages Class Members;

(f)      740 Ill. Comp. Stat. Ann. 10 / 3, *et seq.*, with respect to purchases in

Illinois by the Damages Class Members;

(g)      Iowa Code §§ 553, *et seq.*, with respect to purchases in Iowa by the

Damages Class Members;

(h)      Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases in Kansas by

Damages Class Members;

(i)      Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*, with respect to purchases in

Maine by the Damages Class Members;

(j)      Md. Code, Com. Law § 11-201, *et seq.*, with respect to purchases in

Maryland by the Damages Class Members;

(k)      Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases in

Michigan by the Damages Class Members;

(l)      Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases in Minnesota by

the Damages Class Members;

(m)      Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases in

Mississippi by members of the Damages Class Members;

(n)      Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases in Nebraska

by the Damages Class Members;

(o)    Nev. Rev. Stat. Ann. §§ 598A, *et seq*., with respect to purchases in Nevada by the Damages Class Members, in that sales of Bystolic took place in Nevada, purchased by Nevada end payers at supracompetitive prices caused by Defendants' conduct;

(p)    N.H. Rev. Stat. Ann. §§ 356:1, *et seq*., with respect to purchases in New Hampshire by the Damages Class Members;

(q)    N.M. Stat. Ann. §§ 57-1-1, *et seq*., with respect to purchases in New Mexico by the Damages Class Members;

(r)    N.Y. Gen. Bus. L. §§ 340, *et seq*., with respect to purchases in New York by the Damages Class Members;

(s)    N.C. Gen. Stat. §§ 75-1, *et seq*., with respect to purchases in North Carolina by the Damages Class Members;

(t)    N.D. Cent. Code §§ 51-08.1-01, *et seq*., with respect to purchases in North Dakota by the Damages Class Members;

(u)    Or. Rev. Stat. §§ 6.46.705, *et seq*., with respect to purchases in Oregon by the Damages Class Members;

(v)    R.I. Gen. Laws §§ 6-36-4, *et seq*., with respect to purchases in Rhode Island by the Damages Class Members;

(w)    S.D. Codified Laws Ann. §§ 37-1, *et seq*., with respect to purchases in South Dakota by the Damages Class Members;

(x)    Tenn. Code Ann. §§ 47-25-101, *et seq*., with respect to purchases in Tennessee by the Damages Class Members, with end payers in Tennessee paying substantially higher prices for Bystolic in Tennessee;

(y)     Utah Code Ann. §§ 76-10-3101, *et seq*., with respect to purchases in Utah by Damages Class Members who are either citizens or residents of Utah;

(z)     Vt. Stat. Ann. 9, §§ 2453, *et seq*., with respect to purchases in Vermont by the Damages Class Members;

(aa)    W.Va. Code §§ 47-18-3, *et seq*., with respect to purchases in West Virginia by the Damages Class Members; and

(bb)    Wis. Stat. §§ 133.03, *et seq*., with respect to purchases in Wisconsin by the Damages Class Members, in that the actions alleged herein substantially affected the people of Wisconsin, with thousands of end payers in Wisconsin paying substantially higher prices for Bystolic in Wisconsin.

259.    Plaintiff and the Damages Class Members seek damages and multiple damages as permitted by law for the injuries they suffered as a result of Defendants' anticompetitive conduct.

## CLAIM TEN

### CONTRACT, COMBINATION, CONSPIRACY, OR ARRANGEMENT IN VIOLATION OF STATE ANTITRUST LAWS (AGREEMENT NOT TO COMPETE BETWEEN DEFENDANTS AND TORRENT)

260.    Plaintiff incorporates the preceding paragraphs by reference.

261.    Starting on or about November 21, 2012, Forest and Torrent entered into illegal contracts, combinations, conspiracies and arrangements in restraint of trade under which Forest agreed to make large reverse payments to Torrent in exchange for Torrent's agreement to delay bringing its AB-rated generic Bystolic to the market until September 17, 2021. The purpose and effect of these reverse payments was to: (a) allocate to Forest 100% of the U.S. sales of Nebivolol HCl until September 17, 2021; (b) delay the availability of AB-rated generic Bystolic in the United States, thereby protecting Bystolic from any generic competition until September

17, 2021; and (c) fix and maintain, at supracompetitive levels, the price Plaintiff and Damages

Class members paid for Nebivolol HCl.

262.    The reverse payments to Torrent were unlawful, large, and unjustified.

263.    The reverse payments to Torrent harmed Plaintiff and the Damages Class as set

forth above.

264.    There is and was no legitimate, non-pretextual, procompetitive justification for

the reverse payments from Forest to Torrent that outweighs their harmful effect. Even if there

were some conceivable such justification, the payments were not necessary to achieve, nor the

least restrictive means of achieving, such a purpose.

265.    As a direct and proximate result of the Forest-Torrent pay-for-delay agreements in

restraint of trade, Plaintiff and the Damages Class were harmed and suffered overcharge

damages. Specifically, without the reverse payments, Torrent would have launched its AB-rated

generic version of Bystolic upon receiving final FDA approval, or via a lawful, separate, and

independent settlement agreement whereby reasonable parties in the position of Forest and

Torrent would have agreed upon earlier entry dates untainted by delay associated with the

unlawful Torrent side-deal and other reverse-payments. In addition, by operation of the CLPs,

any earlier license date agreed to between Torrent and Forest would also have applied to all

earlier settling Generic Competitors.

266.    Accordingly, Defendants' anticompetitive agreement with Torrent violated the

following state antitrust laws:

(a)     Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases in Arizona

by the Damages Class Members;

(b)      Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases in California by the Damages Class Members;

(c)      Conn. Gen. Stat. § 35-24, *et seq.*, with respect to purchases in Connecticut by the Damages Class Members;

(d)      D.C. Code Ann. §§ 28-4501, *et seq.*, with respect to purchases in the District of Columbia by the Damages Class Members;

(e)      Hawaii Code § 480, *et seq.*, with respect to purchases in Hawaii by the Damages Class Members;

(f)      740 Ill. Comp. Stat. Ann. 10 / 3, *et seq.*, with respect to purchases in Illinois by the Damages Class Members;

(g)      Iowa Code §§ 553, *et seq.*, with respect to purchases in Iowa by the Damages Class Members;

(h)      Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases in Kansas by Damages Class Members;

(i)      Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*, with respect to purchases in Maine by the Damages Class Members;

(j)      Md. Code, Com. Law § 11-201, *et seq.*, with respect to purchases in Maryland by the Damages Class Members;

(k)      Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases in Michigan by the Damages Class Members;

(l)      Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases in Minnesota by the Damages Class Members;

(m)     Miss. Code Ann. §§ 75-21-1, *et seq*., with respect to purchases in Mississippi by members of the Damages Class Members;

(n)     Neb. Code Ann. §§ 59-801, *et seq*., with respect to purchases in Nebraska by the Damages Class Members;

(o)     Nev. Rev. Stat. Ann. §§ 598A, *et seq*., with respect to purchases in Nevada by the Damages Class Members, in that sales of Bystolic took place in Nevada, purchased by Nevada end payers at supracompetitive prices caused by Defendants' conduct;

(p)     N.H. Rev. Stat. Ann. §§ 356:1, *et seq*., with respect to purchases in New Hampshire by the Damages Class Members;

(q)     N.M. Stat. Ann. §§ 57-1-1, *et seq*., with respect to purchases in New Mexico by the Damages Class Members;

(r)     N.Y. Gen. Bus. L. §§ 340, *et seq*., with respect to purchases in New York by the Damages Class Members;

(s)     N.C. Gen. Stat. §§ 75-1, *et seq*., with respect to purchases in North Carolina by the Damages Class Members;

(t)     N.D. Cent. Code §§ 51-08.1-01, *et seq*., with respect to purchases in North Dakota by the Damages Class Members;

(u)     Or. Rev. Stat. §§ 6.46.705, *et seq*., with respect to purchases in Oregon by the Damages Class Members;

(v)     R.I. Gen. Laws §§ 6-36-4, *et seq*., with respect to purchases in Rhode Island by the Damages Class Members;

(w)     S.D. Codified Laws Ann. §§ 37-1, *et seq*., with respect to purchases in South Dakota by the Damages Class Members;

(x)     Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases in Tennessee by the Damages Class Members, with end payers in Tennessee paying substantially higher prices for Bystolic in Tennessee;

(y)     Utah Code Ann. §§ 76-10-3101, *et seq.*, with respect to purchases in Utah by Damages Class Members who are either citizens or residents of Utah;

(z)     Vt. Stat. Ann. 9, §§ 2453, *et seq.*, with respect to purchases in Vermont by the Damages Class Members;

(aa)     W.Va. Code §§ 47-18-3, *et seq.*, with respect to purchases in West Virginia by the Damages Class Members; and

(bb)     Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases in Wisconsin by the Damages Class Members, in that the actions alleged herein substantially affected the people of Wisconsin, with thousands of end payers in Wisconsin paying substantially higher prices for Bystolic in Wisconsin.

267.     Plaintiff and the Damages Class Members seek damages and multiple damages as permitted by law for the injuries they suffered as a result of Defendants' anticompetitive conduct.

## CLAIM ELEVEN

### CONTRACT, COMBINATION, CONSPIRACY, OR ARRANGEMENT IN VIOLATION OF STATE ANTITRUST LAWS (AGREEMENT NOT TO COMPETE BETWEEN DEFENDANTS AND ALKEM)

268.     Plaintiff incorporates the preceding paragraphs by reference.

269.     Starting on or about November 27, 2012, Forest and Alkem entered into illegal contracts, combinations, conspiracies and arrangements in restraint of trade under which Forest agreed to make large reverse payments to Alkem in exchange for Alkem's agreement to delay bringing AB-rated generic Bystolic to the market until September 17, 2021. The purpose and

effect of these reverse payments was to: (a) allocate to Forest 100% of the U.S. sales of Nebivolol HCl until September 17, 2021; (b) delay the availability of AB-rated generic Bystolic in the United States, thereby protecting Bystolic from any generic competition until September 17, 2021; and (c) fix and maintain, at supracompetitive levels, the price Plaintiff and Damages Class members paid for Nebivolol HCl.

270.     The reverse payments to Alkem were unlawful, large, and unjustified.

271.     The reverse payments to Alkem harmed Plaintiff and the Damages Class as set forth above.

272.     There is and was no legitimate, non-pretextual, procompetitive justification for the reverse payments from Forest to Alkem that outweighs their harmful effect. Even if there were some conceivable such justification, the payments were not necessary to achieve, nor the least restrictive means of achieving, such a purpose.

273.     As a direct and proximate result of the Forest-Alkem pay-for-delay agreements in restraint of trade, Plaintiff and the Damages Class were harmed and suffered overcharge damages. Specifically, without the reverse payments, Alkem would have launched its AB-rated generic version of Bystolic upon receiving final FDA approval, or via a lawful, separate, and independent settlement agreement whereby reasonable parties in the position of Forest and Alkem would have agreed upon earlier entry dates untainted by delay associated with the unlawful Alkem side-deal and other reverse payments. In addition, by operation of the CLPs, any earlier license date agreed to between Alkem and Forest would also have applied to all earlier settling Generic Competitors.

274.     Accordingly, Defendants' anticompetitive agreement with Alkem violated the following state antitrust laws:

(a)     Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases in Arizona by the Damages Class Members;

(b)     Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases in California by the Damages Class Members;

(c)     Conn. Gen. Stat. § 35-24, *et seq.*, with respect to purchases in Connecticut by the Damages Class Members;

(d)     D.C. Code Ann. §§ 28-4501, *et seq.*, with respect to purchases in the District of Columbia by the Damages Class Members;

(e)     Hawaii Code § 480, *et seq.*, with respect to purchases in Hawaii by the Damages Class Members;

(f)     740 Ill. Comp. Stat. Ann. 10 / 3, *et seq.*, with respect to purchases in Illinois by the Damages Class Members;

(g)     Iowa Code §§ 553, *et seq.*, with respect to purchases in Iowa by the Damages Class Members;

(h)     Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases in Kansas by Damages Class Members;

(i)     Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*, with respect to purchases in Maine by the Damages Class Members;

(j)     Md. Code, Com. Law § 11-201, *et seq.*, with respect to purchases in Maryland by the Damages Class Members;

(k)     Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases in Michigan by the Damages Class Members;

(l)    Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases in Minnesota by the Damages Class Members;

(m)    Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases in Mississippi by members of the Damages Class Members;

(n)    Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases in Nebraska by the Damages Class Members;

(o)    Nev. Rev. Stat. Ann. §§ 598A, *et seq.*, with respect to purchases in Nevada by the Damages Class Members, in that sales of Bystolic took place in Nevada, purchased by Nevada end payers at supracompetitive prices caused by Defendants' conduct;

(p)    N.H. Rev. Stat. Ann. §§ 356:1, *et seq.*, with respect to purchases in New Hampshire by the Damages Class Members;

(q)    N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases in New Mexico by the Damages Class Members;

(r)    N.Y. Gen. Bus. L. §§ 340, *et seq.*, with respect to purchases in New York by the Damages Class Members;

(s)    N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases in North Carolina by the Damages Class Members;

(t)    N.D. Cent. Code §§ 51-08.1-01, *et seq.*, with respect to purchases in North Dakota by the Damages Class Members;

(u)    Or. Rev. Stat. §§ 6.46.705, *et seq.*, with respect to purchases in Oregon by the Damages Class Members;

(v)    R.I. Gen. Laws §§ 6-36-4, *et seq.*, with respect to purchases in Rhode Island by the Damages Class Members;

(w)    S.D. Codified Laws Ann. §§ 37-1, *et seq*., with respect to purchases in South Dakota by the Damages Class Members;

(x)    Tenn. Code Ann. §§ 47-25-101, *et seq*., with respect to purchases in Tennessee by the Damages Class Members, with end payers in Tennessee paying substantially higher prices for Bystolic in Tennessee;

(y)    Utah Code Ann. §§ 76-10-3101, *et seq*., with respect to purchases in Utah by Damages Class Members who are either citizens or residents of Utah;

(z)    Vt. Stat. Ann. 9, §§ 2453, *et seq*., with respect to purchases in Vermont by the Damages Class Members;

(aa)    W.Va. Code §§ 47-18-3, *et seq*., with respect to purchases in West Virginia by the Damages Class Members; and

(bb)    Wis. Stat. §§ 133.03, *et seq*., with respect to purchases in Wisconsin by the Damages Class Members, in that the actions alleged herein substantially affected the people of Wisconsin, with thousands of end payers in Wisconsin paying substantially higher prices for Bystolic in Wisconsin.

275.    Plaintiff and the Damages Class Members seek damages and multiple damages as permitted by law for the injuries they suffered as a result of Defendants' anticompetitive conduct.

## CLAIM TWELVE

### CONTRACT, COMBINATION, CONSPIRACY, OR ARRANGEMENT IN VIOLATION OF STATE ANTITRUST LAWS (AGREEMENT NOT TO COMPETE BETWEEN DEFENDANTS AND INDCHEMIE)

276.    Plaintiff incorporates the preceding paragraphs by reference.

277.    Starting on or about November 27, 2012, Forest and Indchemie entered into illegal contracts, combinations, conspiracies and arrangements in restraint of trade under which

Forest agreed to make large reverse payments to Indchemie in exchange for Indchemie's agreement to delay bringing AB-rated generic Bystolic to the market until September 17, 2021. The purpose and effect of these reverse payments was to: (a) allocate to Forest 100% of the U.S. sales of Nebivolol HCl until September 17, 2021; (b) delay the availability of AB-rated generic Bystolic in the United States, thereby protecting Bystolic from any generic competition until September 17, 2021; and (c) fix and maintain, at supracompetitive levels, the price Plaintiff and Damages Class members paid for Nebivolol HCl.

278.    The reverse payments to Indchemie were unlawful, large, and unjustified.

279.    The reverse payments to Indchemie harmed Plaintiff and the Damages Class as set forth above.

280.    There is and was no legitimate, non-pretextual, procompetitive justification for the reverse-payments from Forest to Indchemie that outweighs their harmful effects. Even if there were some conceivable such justification, the payments were not necessary to achieve, nor the least restrictive means of achieving, such a purpose.

281.    As a direct and proximate result of the Forest-Indchemie pay-for-delay agreements in restraint of trade, Plaintiff and the Damages Class were harmed and suffered overcharge damages. Specifically, without a reverse-payment, Indchemie would have launched its generic version of Bystolic upon receiving final FDA approval, or via a lawful, separate, and independent settlement agreement whereby reasonable parties in the position of Forest and Indchemie would have agreed upon earlier entry dates untainted by delay associated with the unlawful Indchemie side-deal and other reverse payments. In addition, by operation of the CLPs, any earlier license date agreed to between Indchemie and Forest would also have applied to all earlier settling Generic Competitors.

282.    Accordingly, Defendants' anticompetitive agreement with Indchemie violated the following state antitrust laws:

(a)    Ariz. Rev. Stat. §§ 44-1401, *et seq*., with respect to purchases in Arizona by the Damages Class Members;

(b)    Cal. Bus. Code §§ 16700, *et seq*., and Cal. Bus. Code §§ 17200, *et seq*., with respect to purchases in California by the Damages Class Members;

(c)    Conn. Gen. Stat. § 35-24, *et seq*., with respect to purchases in Connecticut by the Damages Class Members;

(d)    D.C. Code Ann. §§ 28-4501, *et seq*., with respect to purchases in the District of Columbia by the Damages Class Members;

(e)    Hawaii Code § 480, *et seq*., with respect to purchases in Hawaii by the Damages Class Members;

(f)    740 Ill. Comp. Stat. Ann. 10 / 3, *et seq*., with respect to purchases in Illinois by the Damages Class Members;

(g)    Iowa Code §§ 553, *et seq*., with respect to purchases in Iowa by the Damages Class Members;

(h)    Kan. Stat. Ann. §§ 50-101, *et seq*., with respect to purchases in Kansas by Damages Class Members;

(i)    Me. Rev. Stat. Ann. 10, §§ 1101, *et seq*., with respect to purchases in Maine by the Damages Class Members;

(j)    Md. Code, Com. Law § 11-201, *et seq*., with respect to purchases in Maryland by the Damages Class Members;

(k)     Mich. Comp. Laws Ann. §§ 445.772, *et seq*., with respect to purchases in Michigan by the Damages Class Members;

(l)     Minn. Stat. §§ 325D.49, *et seq*., with respect to purchases in Minnesota by the Damages Class Members;

(m)     Miss. Code Ann. §§ 75-21-1, *et seq*., with respect to purchases in Mississippi by members of the Damages Class Members;

(n)     Neb. Code Ann. §§ 59-801, *et seq*., with respect to purchases in Nebraska by the Damages Class Members;

(o)     Nev. Rev. Stat. Ann. §§ 598A, *et seq*., with respect to purchases in Nevada by the Damages Class Members, in that sales of Bystolic took place in Nevada, purchased by Nevada end payers at supracompetitive prices caused by Defendants' conduct;

(p)     N.H. Rev. Stat. Ann. §§ 356:1, *et seq*., with respect to purchases in New Hampshire by the Damages Class Members;

(q)     N.M. Stat. Ann. §§ 57-1-1, *et seq*., with respect to purchases in New Mexico by the Damages Class Members;

(r)     N.Y. Gen. Bus. L. §§ 340, *et seq*., with respect to purchases in New York by the Damages Class Members;

(s)     N.C. Gen. Stat. §§ 75-1, *et seq*., with respect to purchases in North Carolina by the Damages Class Members;

(t)     N.D. Cent. Code §§ 51-08.1-01, *et seq*., with respect to purchases in North Dakota by the Damages Class Members;

(u)     Or. Rev. Stat. §§ 6.46.705, *et seq*., with respect to purchases in Oregon by the Damages Class Members;

(v)     R.I. Gen. Laws §§ 6-36-4, *et seq*., with respect to purchases in Rhode

Island by the Damages Class Members;

(w)     S.D. Codified Laws Ann. §§ 37-1, *et seq*., with respect to purchases in

South Dakota by the Damages Class Members;

(x)     Tenn. Code Ann. §§ 47-25-101, *et seq*., with respect to purchases in

Tennessee by the Damages Class Members, with end payers in Tennessee paying substantially

higher prices for Bystolic in Tennessee;

(y)     Utah Code Ann. §§ 76-10-3101, *et seq*., with respect to purchases in Utah

by Damages Class Members who are either citizens or residents of Utah;

(z)     Vt. Stat. Ann. 9, §§ 2453, *et seq*., with respect to purchases in Vermont by

the Damages Class Members;

(aa)    W.Va. Code §§ 47-18-3, *et seq*., with respect to purchases in West

Virginia by the Damages Class Members; and

(bb)    Wis. Stat. §§ 133.03, *et seq*., with respect to purchases in Wisconsin by

the Damages Class Members, in that the actions alleged herein substantially affected the people

of Wisconsin, with thousands of end payers in Wisconsin paying substantially higher prices for

Bystolic in Wisconsin.

283.    Plaintiff and the Damages Class Members seek damages and multiple damages as

permitted by law for the injuries they suffered as a result of Defendants' anticompetitive

conduct.

## CLAIM THIRTEEN

### CONTRACT, COMBINATION, CONSPIRACY, OR ARRANGEMENT IN VIOLATION OF STATE ANTITRUST LAWS (AGREEMENT NOT TO COMPETE  BETWEEN DEFENDANTS AND GLENMARK)

284.    Plaintiff incorporates the preceding paragraphs by reference.

285.    Starting on or about December 21, 2012, Forest and Glenmark entered into illegal contracts, combinations, conspiracies and arrangements in restraint of trade under which Forest agreed to make large reverse payments to Glenmark in exchange for Glenmark's agreement to delay bringing AB-rated generic Bystolic to the market until September 17, 2021. The purpose and effect of these reverse payments was to: (a) allocate to Forest 100% of the U.S. sales of Nebivolol HCl until September 17, 2021; (b) delay the availability of AB-rated generic Bystolic in the United States, thereby protecting Bystolic from any generic competition until September 17, 2021; and (c) fix and maintain, at supracompetitive levels, the price Plaintiff and Damages Class members paid for Nebivolol HCl.

286.    The reverse payments to Glenmark were unlawful, large, and unjustified.

287.    The reverse payments to Glenmark harmed Plaintiff and the Damages Class as set forth above.

288.    There is and was no legitimate, non-pretextual, procompetitive justification for the reverse payments from Forest to Glenmark that outweighs its harmful effect. Even if there were some conceivable such justification, the payments were not necessary to achieve, nor the least restrictive means of achieving, such a purpose.

289.    As a direct and proximate result of the Forest-Glenmark pay-for-delay agreements in restraint of trade, Plaintiff and the Damages Class were harmed and suffered overcharge damages. Specifically, without the reverse payments, Glenmark would have launched its AB-rated generic version of Bystolic upon receiving final FDA approval, or via a lawful, separate, and independent settlement agreement whereby reasonable parties in the position of Forest and Glenmark would have agreed upon earlier entry dates untainted by delay associated with the unlawful Glenmark side-deal and other reverse payments. In addition, by operation of the CLPs,

any earlier license date agreed to between Glenmark and Forest would also have applied to all earlier settling Generic Competitors.

290.    Accordingly, Defendants' anticompetitive agreement with Glenmark violated the following state antitrust laws:

(a)    Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases in Arizona by the Damages Class Members;

(b)    Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases in California by the Damages Class Members;

(c)    Conn. Gen. Stat. § 35-24, *et seq.*, with respect to purchases in Connecticut by the Damages Class Members;

(d)    D.C. Code Ann. §§ 28-4501, *et seq.*, with respect to purchases in the District of Columbia by the Damages Class Members;

(e)    Hawaii Code § 480, *et seq.*, with respect to purchases in Hawaii by the Damages Class Members;

(f)    740 Ill. Comp. Stat. Ann. 10 / 3, *et seq.*, with respect to purchases in Illinois by the Damages Class Members;

(g)    Iowa Code §§ 553, *et seq.*, with respect to purchases in Iowa by the Damages Class Members;

(h)    Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases in Kansas by Damages Class Members;

(i)    Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*, with respect to purchases in Maine by the Damages Class Members;

(j)        Md. Code, Com. Law § 11-201, *et seq.*, with respect to purchases in

Maryland by the Damages Class Members;

(k)        Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases in

Michigan by the Damages Class Members;

(l)        Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases in Minnesota by

the Damages Class Members;

(m)        Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases in

Mississippi by members of the Damages Class Members;

(n)        Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases in Nebraska

by the Damages Class Members;

(o)        Nev. Rev. Stat. Ann. §§ 598A, *et seq.*, with respect to purchases in Nevada

by the Damages Class Members, in that sales of Bystolic took place in Nevada, purchased by

Nevada end payers at supracompetitive prices caused by Defendants' conduct;

(p)        N.H. Rev. Stat. Ann. §§ 356:1, *et seq.*, with respect to purchases in New

Hampshire by the Damages Class Members;

(q)        N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases in New

Mexico by the Damages Class Members;

(r)        N.Y. Gen. Bus. L. §§ 340, *et seq.*, with respect to purchases in New York

by the Damages Class Members;

(s)        N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases in North

Carolina by the Damages Class Members;

(t)        N.D. Cent. Code §§ 51-08.1-01, *et seq.*, with respect to purchases in North

Dakota by the Damages Class Members;

(u)     Or. Rev. Stat. §§ 6.46.705, *et seq.*, with respect to purchases in Oregon by the Damages Class Members;

(v)     R.I. Gen. Laws §§ 6-36-4, *et seq.*, with respect to purchases in Rhode Island by the Damages Class Members;

(w)     S.D. Codified Laws Ann. §§ 37-1, *et seq.*, with respect to purchases in South Dakota by the Damages Class Members;

(x)     Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases in Tennessee by the Damages Class Members, with end payers in Tennessee paying substantially higher prices for Bystolic in Tennessee;

(y)     Utah Code Ann. §§ 76-10-3101, *et seq.*, with respect to purchases in Utah by Damages Class Members who are either citizens or residents of Utah;

(z)     Vt. Stat. Ann. 9, §§ 2453, *et seq.*, with respect to purchases in Vermont by the Damages Class Members;

(aa)    W.Va. Code §§ 47-18-3, *et seq.*, with respect to purchases in West Virginia by the Damages Class Members; and

(bb)    Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases in Wisconsin by the Damages Class Members, in that the actions alleged herein substantially affected the people of Wisconsin, with thousands of end payers in Wisconsin paying substantially higher prices for Bystolic in Wisconsin.

291.    Plaintiff and the Damages Class Members seek damages and multiple damages as permitted by law for the injuries they suffered as a result of Defendants' anticompetitive conduct.

**CLAIM FOURTEEN**

**CONTRACT, COMBINATION, CONSPIRACY, OR ARRANGEMENT IN VIOLATION OF STATE ANTITRUST LAWS (AGREEMENT NOT TO COMPETE BETWEEN DEFENDANTS AND AMERIGEN)**

292.    Plaintiff incorporates the preceding paragraphs by reference.

293.    Starting on or about July 18, 2012, Forest and Amerigen entered into illegal contracts, combinations, conspiracies and arrangements in restraint of trade under which Forest agreed to make large reverse payments to Amerigen in exchange for Amerigen's agreement to delay bringing AB-rated generic Bystolic to the market until September 17, 2021. The purpose and effect of these reverse payments was to: (a) allocate to Forest 100% of the U.S. sales of Nebivolol HCl until September 17, 2021; (b) delay the availability of AB-rated generic Bystolic in the United States, thereby protecting Bystolic from any generic competition until September 17, 2021; and (c) fix and maintain, at supracompetitive levels, the price Plaintiff and Damages Class members paid for Nebivolol HCl.

294.    The reverse payments to Amerigen were unlawful, large, and unjustified.

295.    The reverse payments to Amerigen harmed Plaintiff and the Damages Class as set forth above.

296.    There is and was no legitimate, non-pretextual, procompetitive justification for the reverse payments from Forest to Amerigen that outweighs its harmful effect. Even if there were some conceivable such justification, the payments were not necessary to achieve, nor the least restrictive means of achieving, such a purpose.

297.    As a direct and proximate result of the Forest-Amerigen pay-for-delay agreements in restraint of trade, Plaintiff and the Damages Class were harmed and suffered overcharge damages. Specifically, without the reverse payments, Amerigen would have launched its AB-rated generic version of Bystolic upon receiving final FDA approval, or via a lawful, separate,

and independent settlement agreement whereby reasonable parties in the position of Forest and Amerigen would have agreed upon earlier entry dates untainted by delay associated with the unlawful Amerigen side-deal and other reverse payments. In addition, by operation of the CLPs, any earlier license date agreed to between Amerigen and Forest would also have applied to all earlier settling Generic Competitors.

298.    Accordingly, Defendants' anticompetitive agreement with Amerigen violated the following state antitrust laws:

(a)    Ariz. Rev. Stat. §§ 44-1401, *et seq*., with respect to purchases in Arizona by the Damages Class Members;

(b)    Cal. Bus. Code §§ 16700, *et seq*., and Cal. Bus. Code §§ 17200, *et seq*., with respect to purchases in California by the Damages Class Members;

(c)    Conn. Gen. Stat. § 35-24, *et seq*., with respect to purchases in Connecticut by the Damages Class Members;

(d)    D.C. Code Ann. §§ 28-4501, *et seq*., with respect to purchases in the District of Columbia by the Damages Class Members;

(e)    Hawaii Code § 480, *et seq*., with respect to purchases in Hawaii by the Damages Class Members;

(f)    740 Ill. Comp. Stat. Ann. 10 / 3, *et seq*., with respect to purchases in Illinois by the Damages Class Members;

(g)    Iowa Code §§ 553, *et seq*., with respect to purchases in Iowa by the Damages Class Members;

(h)    Kan. Stat. Ann. §§ 50-101, *et seq*., with respect to purchases in Kansas by Damages Class Members;

(i)      Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*, with respect to purchases in

Maine by the Damages Class Members;

(j)      Md. Code, Com. Law § 11-201, *et seq.*, with respect to purchases in

Maryland by the Damages Class Members;

(k)      Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases in

Michigan by the Damages Class Members;

(l)      Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases in Minnesota by

the Damages Class Members;

(m)      Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases in

Mississippi by members of the Damages Class Members;

(n)      Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases in Nebraska

by the Damages Class Members;

(o)      Nev. Rev. Stat. Ann. §§ 598A, *et seq.*, with respect to purchases in Nevada

by the Damages Class Members, in that sales of Bystolic took place in Nevada, purchased by

Nevada end payers at supracompetitive prices caused by Defendants' conduct;

(p)      N.H. Rev. Stat. Ann. §§ 356:1, *et seq.*, with respect to purchases in New

Hampshire by the Damages Class Members;

(q)      N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases in New

Mexico by the Damages Class Members;

(r)      N.Y. Gen. Bus. L. §§ 340, *et seq.*, with respect to purchases in New York

by the Damages Class Members;

(s)      N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases in North

Carolina by the Damages Class Members;

(t)      N.D. Cent. Code §§ 51-08.1-01, *et seq*., with respect to purchases in North Dakota by the Damages Class Members;

(u)      Or. Rev. Stat. §§ 6.46.705, *et seq*., with respect to purchases in Oregon by the Damages Class Members;

(v)      R.I. Gen. Laws §§ 6-36-4, *et seq*., with respect to purchases in Rhode Island by the Damages Class Members;

(w)      S.D. Codified Laws Ann. §§ 37-1, *et seq*., with respect to purchases in South Dakota by the Damages Class Members;

(x)      Tenn. Code Ann. §§ 47-25-101, *et seq*., with respect to purchases in Tennessee by the Damages Class Members, with end payers in Tennessee paying substantially higher prices for Bystolic in Tennessee;

(y)      Utah Code Ann. §§ 76-10-3101, *et seq*., with respect to purchases in Utah by Damages Class Members who are either citizens or residents of Utah;

(z)      Vt. Stat. Ann. 9, §§ 2453, *et seq*., with respect to purchases in Vermont by the Damages Class Members;

(aa)     W.Va. Code §§ 47-18-3, *et seq*., with respect to purchases in West Virginia by the Damages Class Members; and

(bb)     Wis. Stat. §§ 133.03, *et seq*., with respect to purchases in Wisconsin by the Damages Class Members, in that the actions alleged herein substantially affected the people of Wisconsin, with thousands of end payers in Wisconsin paying substantially higher prices for Bystolic in Wisconsin.

299.    Plaintiff and the Damages Class Members seek damages and multiple damages as permitted by law for the injuries they suffered as a result of Defendants' anticompetitive conduct.

**CLAIM FIFTEEN**

**CONTRACT, COMBINATION, CONSPIRACY, OR ARRANGEMENT IN VIOLATION OF STATE ANTITRUST LAWS (AGREEMENT NOT TO COMPETE BETWEEN DEFENDANTS AND WATSON)**

300.    Plaintiff incorporates the preceding paragraphs by reference.

301.    Starting on or about November 1, 2013, Forest and Watson entered into illegal contracts, combinations, conspiracies and arrangements in restraint of trade under which Forest agreed to make large reverse-payments to Watson in exchange for Watson's agreement to delay bringing AB-rated generic Bystolic to the market until September 17, 2021. The purpose and effect of these reverse payments was to: (a) allocate to Forest 100% of the U.S. sales of Nebivolol HCl until September 17, 2021; (b) delay the availability of AB-rated generic Bystolic in the United States, thereby protecting Bystolic from any generic competition until September 17, 2021; and (c) fix and maintain, at supracompetitive levels, the price Plaintiff and Damages Class members paid for Nebivolol HCl.

302.    The reverse payments to Watson were unlawful, large, and unjustified.

303.    The reverse payments to Watson harmed Plaintiff and the Damages Class as set forth above.

304.    There is and was no legitimate, non-pretextual, procompetitive justification for the reverse payments from Forest to Watson that outweighs its harmful effect. Even if there were some conceivable such justification, the payments were not necessary to achieve, nor the least restrictive means of achieving, such a purpose.

305.    As a direct and proximate result of the Forest-Watson pay-for-delay agreements in restraint of trade, Plaintiff and the Damages Class were harmed and suffered overcharge damages. Specifically, without the reverse payments, Watson would have launched its generic version of Bystolic upon receiving final FDA approval, or via a lawful, separate, and independent settlement agreement whereby reasonable parties in the position of Forest and Watson would have agreed upon earlier entry dates untainted by delay associated with the unlawful Watson side-deal and other reverse payments. In addition, by operation of the CLPs, any earlier license date agreed to between Watson and Forest would also have applied to all earlier-settling Generic Competitors.

306.    Accordingly, Defendants' anticompetitive agreement with Watson violated the following state antitrust laws:

(a)    Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases in Arizona by the Damages Class Members;

(b)    Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases in California by the Damages Class Members;

(c)    Conn. Gen. Stat. § 35-24, *et seq.*, with respect to purchases in Connecticut by the Damages Class Members;

(d)    D.C. Code Ann. §§ 28-4501, *et seq.*, with respect to purchases in the District of Columbia by the Damages Class Members;

(e)    Hawaii Code § 480, *et seq.*, with respect to purchases in Hawaii by the Damages Class Members;

(f)    740 Ill. Comp. Stat. Ann. 10 / 3, *et seq.*, with respect to purchases in Illinois by the Damages Class Members;

(g)     Iowa Code §§ 553, *et seq*., with respect to purchases in Iowa by the Damages Class Members;

(h)     Kan. Stat. Ann. §§ 50-101, *et seq*., with respect to purchases in Kansas by Damages Class Members;

(i)     Me. Rev. Stat. Ann. 10, §§ 1101, *et seq*., with respect to purchases in Maine by the Damages Class Members;

(j)     Md. Code, Com. Law § 11-201, *et seq*., with respect to purchases in Maryland by the Damages Class Members;

(k)     Mich. Comp. Laws Ann. §§ 445.772, *et seq*., with respect to purchases in Michigan by the Damages Class Members;

(l)     Minn. Stat. §§ 325D.49, *et seq*., with respect to purchases in Minnesota by the Damages Class Members;

(m)     Miss. Code Ann. §§ 75-21-1, *et seq*., with respect to purchases in Mississippi by members of the Damages Class Members;

(n)     Neb. Code Ann. §§ 59-801, *et seq*., with respect to purchases in Nebraska by the Damages Class Members;

(o)     Nev. Rev. Stat. Ann. §§ 598A, *et seq*., with respect to purchases in Nevada by the Damages Class Members, in that sales of Bystolic took place in Nevada, purchased by Nevada end payers at supracompetitive prices caused by Defendants' conduct;

(p)     N.H. Rev. Stat. Ann. §§ 356:1, *et seq*., with respect to purchases in New Hampshire by the Damages Class Members;

(q)     N.M. Stat. Ann. §§ 57-1-1, *et seq*., with respect to purchases in New Mexico by the Damages Class Members;

(r)    N.Y. Gen. Bus. L. §§ 340, *et seq*., with respect to purchases in New York by the Damages Class Members;

(s)    N.C. Gen. Stat. §§ 75-1, *et seq*., with respect to purchases in North Carolina by the Damages Class Members;

(t)    N.D. Cent. Code §§ 51-08.1-01, *et seq*., with respect to purchases in North Dakota by the Damages Class Members;

(u)    Or. Rev. Stat. §§ 6.46.705, *et seq*., with respect to purchases in Oregon by the Damages Class Members;

(v)    R.I. Gen. Laws §§ 6-36-4, *et seq*., with respect to purchases in Rhode Island by the Damages Class Members;

(w)    S.D. Codified Laws Ann. §§ 37-1, *et seq*., with respect to purchases in South Dakota by the Damages Class Members;

(x)    Tenn. Code Ann. §§ 47-25-101, *et seq*., with respect to purchases in Tennessee by the Damages Class Members, with end payers in Tennessee paying substantially higher prices for Bystolic in Tennessee;

(y)    Utah Code Ann. §§ 76-10-3101, *et seq*., with respect to purchases in Utah by Damages Class Members who are either citizens or residents of Utah;

(z)    Vt. Stat. Ann. 9, §§ 2453, *et seq*., with respect to purchases in Vermont by the Damages Class Members;

(aa)    W.Va. Code §§ 47-18-3, *et seq*., with respect to purchases in West Virginia by the Damages Class Members; and

(bb)    Wis. Stat. §§ 133.03, *et seq*., with respect to purchases in Wisconsin by the Damages Class Members, in that the actions alleged herein substantially affected the people

of Wisconsin, with thousands of end payers in Wisconsin paying substantially higher prices for Bystolic in Wisconsin.

307.    Plaintiff and the Damages Class Members seek damages and multiple damages as permitted by law for the injuries they suffered as a result of Defendants' anticompetitive conduct.

## CLAIM SIXTEEN

### MONOPOLIZATION AND MONOPOLISTIC SCHEME IN VIOLATION OF STATE ANTITRUST LAW

308.    Plaintiff incorporates the preceding paragraphs by reference.

309.    At all relevant times prior to September 17, 2021, Defendants possessed substantial market power (*i.e.*, monopoly power) in the relevant market. Defendants possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

310.    By entering into the pay-for-delay agreements with the Generic Competitors, Defendants maintained, enhanced, and extended their monopoly power using restrictive or exclusionary conduct. Specifically, Defendants (a) allocated to themselves 100% of the market for Nebivolol HCl in all strengths in the United States until September 17, 2021; (b) delayed the availability of AB-rated generic versions of Bystolic in the United States, thereby protecting Bystolic from any generic competition until September 17, 2021; and (c) fixed and maintained, at supracompetitive levels, the price Plaintiff and Damages Class members paid for Nebivolol HCl.

311.    As a direct, proximate, foreseeable, and intended result of their illegal and monopolistic conduct, Defendants unlawfully maintained, enhanced, and extended their monopoly power, and Plaintiff and the Damages Class were harmed as a result.

312.    All of Forest's corporate successors, including Allergan and Forest, adopted Defendants' monopolistic scheme and took actions in furtherance of it.

313.    Accordingly, Defendants' scheme violated the following state antitrust laws:

(a)    Ariz. Rev. Stat. §§ 44-1401, *et seq*., with respect to purchases in Arizona by the Damages Class Members;

(b)    Cal. Bus. Code §§ 16700, *et seq*., and Cal. Bus. Code §§ 17200, *et seq*., with respect to purchases in California by the Damages Class Members;

(c)    Conn. Gen. Stat. § 35-24, *et seq*., with respect to purchases in Connecticut by the Damages Class Members;

(d)    D.C. Code Ann. §§ 28-4501, *et seq*., with respect to purchases in the District of Columbia by the Damages Class Members;

(e)    Hawaii Code § 480, *et seq*., with respect to purchases in Hawaii by the Damages Class Members;

(f)    740 Ill. Comp. Stat. Ann. 10 / 3, *et seq*., with respect to purchases in Illinois by the Damages Class Members;

(g)    Iowa Code §§ 553, *et seq*., with respect to purchases in Iowa by the Damages Class Members;

(h)    Kan. Stat. Ann. §§ 50-101, *et seq*., with respect to purchases in Kansas by Damages Class Members;

(i)    Me. Rev. Stat. Ann. 10, §§ 1101, *et seq*., with respect to purchases in Maine by the Damages Class Members;

(j)    Md. Code, Com. Law § 11-201, *et seq*., with respect to purchases in Maryland by the Damages Class Members;

(k)      Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases in

Michigan by the Damages Class Members;

(l)      Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases in Minnesota by

the Damages Class Members;

(m)      Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases in

Mississippi by members of the Damages Class Members;

(n)      Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases in Nebraska

by the Damages Class Members;

(o)      Nev. Rev. Stat. Ann. §§ 598A, *et seq.*, with respect to purchases in Nevada

by the Damages Class Members, in that sales of Bystolic took place in Nevada, purchased by

Nevada end payers at supracompetitive prices caused by Defendants' conduct;

(p)      N.H. Rev. Stat. Ann. §§ 356:1, *et seq.*, with respect to purchases in New

Hampshire by the Damages Class Members;

(q)      N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases in New

Mexico by the Damages Class Members;

(r)      N.Y. Gen. Bus. L. §§ 340, *et seq.*, with respect to purchases in New York

by the Damages Class Members;

(s)      N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases in North

Carolina by the Damages Class Members;

(t)      N.D. Cent. Code §§ 51-08.1-01, *et seq.*, with respect to purchases in North

Dakota by the Damages Class Members;

(u)      Or. Rev. Stat. §§ 6.46.705, *et seq.*, with respect to purchases in Oregon by

the Damages Class Members;

(v)    R.I. Gen. Laws §§ 6-36-4, *et seq.*, with respect to purchases in Rhode Island by the Damages Class Members;

(w)    S.D. Codified Laws Ann. §§ 37-1, *et seq.*, with respect to purchases in South Dakota by the Damages Class Members;

(x)    Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases in Tennessee by the Damages Class Members, with end payers in Tennessee paying substantially higher prices for Bystolic in Tennessee;

(y)    Utah Code Ann. §§ 76-10-3101, *et seq.*, with respect to purchases in Utah by Damages Class Members who are either citizens or residents of Utah;

(z)    Vt. Stat. Ann. 9, §§ 2453, *et seq.*, with respect to purchases in Vermont by the Damages Class Members;

(aa)    W.Va. Code §§ 47-18-3, *et seq.*, with respect to purchases in West Virginia by the Damages Class Members; and

(bb)    Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases in Wisconsin by the Damages Class Members, in that the actions alleged herein substantially affected the people of Wisconsin, with thousands of end payers in Wisconsin paying substantially higher prices for Bystolic in Wisconsin.

314.    Plaintiff and the Damages Class Members seek damages and multiple damages as permitted by law for the injuries they suffered as a result of Defendants' anticompetitive conduct.

## CLAIM SEVENTEEN

### CONDUCT IN VIOLATION OF
### STATE CONSUMER PROTECTION LAWS

315.    Plaintiff incorporates the preceding paragraphs by reference.

316.    By entering into the pay-for-delay agreements with the Generic Competitors, Defendants maintained, enhanced, and extended their monopoly power using restrictive or exclusionary conduct. Specifically, Defendants (a) allocated to themselves 100% of the market for Nebivolol HCl in all strengths in the United States until September 17, 2021; (b) delayed the availability of AB-rated generic versions of Bystolic in the United States, thereby protecting Bystolic from any generic competition until September 17, 2021; and (c) fixed and maintained, at supracompetitive levels, the price Plaintiff and Damages Class members paid for Nebivolol HCl.

317.    There was and is a gross disparity between the price that Plaintiff and Damages Class members paid for Bystolic and the value they received. Much more affordable, AB-rated generic versions of Bystolic would have been available sooner and in greater quantity, and prices for Nebivolol HCl would have been lower, but for Defendants' unfair and unconscionable conduct. Plaintiffs and Damages Class members purchased, paid and/or provided reimbursement for some or all of the price of Nebviolol HCl for purchases intended primarily for personal, family, and/or household use.

318.    Defendants' conduct was intended to, and did, cause substantial injury to Plaintiff and members of the Damages Class in the form of denying them the ability to purchase less-expensive AB-rated generic versions of Bystolic. Plaintiff and other end payors could not reasonably have avoided injury from Defendants' wrongful conduct. Defendants' conduct occurred in connection with consumer transactions related to the availability and sale of Nebivolol HCl products.

319.    There are no countervailing benefits to Defendants' conduct that would outweigh the injury caused to end payers.

320.    Defendants' conduct violates the following state laws:

**California**

321.    The California Unfair Competition Law prohibits any "unlawful" or "unfair . . . business act or practice." Cal. Bus. & Prof. Code § 17200.

322.    By reason of the conduct alleged herein, Defendants' engaged in unfair business acts and practices. Defendants' conduct is also unlawful in that it violates, among other things, the Federal Trade Commission Act, 15 U.S.C. 45, *et seq*. Cal. Bus. & Prof. Code §§ 17200, *et seq*.

323.    This claim is instituted pursuant to §§ 17203 and 17204 of the California Business and Professions Code, to obtain restitution from Defendants' for acts, as alleged herein, that violated the Unfair Competition Law.

324.    Plaintiff and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

325.    Defendants' unlawful and unfair business practices, and each of them, as described above, have caused and will continue to cause Plaintiff and members of the Damages Class to pay supra-competitive and artificially-inflated prices for Nebivolol HCl sold in the State of California. Plaintiff and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. As alleged in this complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiff and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to California Business and Professions Code §§ 17203 and 17204.

**Florida**

326.    The Florida Deceptive & Unfair Trade Practices Act ("FDUTPA") prohibits "unconscionable acts or practices" and "unfair . . . act or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204.

327.    By reason of the conduct alleged herein, Defendants have engaged in unconscionable and unfair acts and practices in the conduct of trade and commerce. Fla. Stat. §§ 501.204, *et seq.*

328.    The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

329.    Plaintiff and members of the Damages Class purchased Bystolic within the state of Florida during the class period. But for Defendants' conduct set forth herein, the price of Bystolic or AB-rated generic versions Bystolic would have been lower, in an amount to be determined at trial.

330.    Defendants' unlawful conduct substantially affected Florida's trade and commerce.

331.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff and the members of the Damages Class have been injured in their business or property by virtue of overcharges for Bystolic and are threatened with further injury.

332.    By reason of the foregoing, Plaintiff and the members of the Damages Class are entitled to seek all forms of relief, including injunctive relief pursuant to Florida Statutes § 501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Florida Statutes § 501.211.

**Massachusetts**

333.    The Massachusetts Consumer Protection Act ("MCPA") regulates trade and commerce "directly or indirectly affecting the people of this commonwealth." Mass. Gen. L. Ch. 93A § 9(1).

334.    Under the MCPA, "[a]ny person, who has been injured by another person's use or employment of any method, act or practice" that constitutes "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. L. Ch. 93A §§ 2, 9(1). MCPA § 2(b) provides that these terms are interpreted consistent with Section 5 of the FTC Act (15 U.S.C. § 45(a)), which also prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." Mass. Gen. L. Ch. 93A § 2(b); 15 U.S. § 45(a)(1).

335.    As a result of Defendants' illegal agreements, Plaintiff and the Damages Class paid more than they would have paid for Nebivolol HCl absent the illegal conduct.

336.    Defendants sold Bystolic in Massachusetts, and their conduct had a direct and substantial impact on trade and commerce in Massachusetts. Accordingly, such conduct falls within the prohibitions in Ch. 93A § 2.

**Missouri**

337.    Under Section 407.020, the Missouri Merchandising Practices Act ("MMPA") prohibits "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Rev. Stat. 407.020.

338.    The Missouri Attorney General has defined an "unfair practice" as:

> any practice which . . . [o]ffends any public policy as it has been
> established by the Constitution, statutes or common law of this
> state, or by the Federal Trade Commission, or its interpretive
> decisions; or . . . [i]s unethical, oppressive, or unscrupulous; and . .
> . [p]resents a risk of, or causes, substantial injury to consumers.

Mo. Att'y Gen. Reg., 15 CSR 60-8.02.

339.    As a result of Defendants' illegal agreement and other unlawful conduct, Plaintiff

and the Damages Class paid more than they would have paid for Nebivolol HCl, absent the

illegal conduct.

340.    Defendants sold Bystolic in Missouri, and Defendants' conduct had a direct and

substantial impact on trade and commerce in Missouri. Upon information and belief, Defendants

also directed advertising and marketing efforts for Bystolic in Missouri. Accordingly,

Defendants' conduct falls within the prohibitions in the MMPA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the proposed Classes, respectfully

demands that this Court:

(a)    Determines that this action may be maintained as a class action pursuant to

Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and directs that

reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Classes, and

declares Plaintiff as a representative of the Classes;

(b)    Enters joint and several judgments against the Defendants and in favor of

Plaintiff and the Classes;

(c)    Grants Plaintiff and the Nationwide Injunction Class injunctive and

equitable relief;

(d)    Awards the Damages Class damages, to the extent permitted by law, in an

amount to be determined at trial;

(e)    Awards Plaintiff and the Classes their costs of suit, including reasonable attorneys' fees as provided by law; and

(f)    Awards such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMANDED

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of itself and the proposed Classes, demands a trial by jury on all issues so triable.

DATED: July 27, 2020                    Respectfully submitted,


                                        */s/ Gregory S. Asciolla*
                                        Gregory S. Asciolla
                                        Karin E. Garvey
                                        Domenica Minerva
                                        Matthew J. Perez
                                        Veronica Bosco
                                        **LABATON SUCHAROW LLP**
                                        140 Broadway
                                        New York, NY 10005
                                        Tel: (212) 907-0700
                                        Fax: (212) 818-0477
                                        gasciolla@labaton.com
                                        kgarvey@labaton.com
                                        dminerva@labaton.com
                                        mperez@labaton.com
                                        vbosco@labaton.com

                                        Roberta D. Liebenberg
                                        Paul Costa
                                        Adam Pessin
                                        Mary L. Russell
                                        **FINE, KAPLAN AND BLACK, R.P.C.**
                                        One South Broad Street, 23rd Floor
                                        Philadelphia, PA 19107
                                        Tel: (215) 567-6565
                                        Fax: (215) 568-5872
                                        rliebenberg@finekaplan.com
                                        pcosta@finekaplan.com
                                        apessin@finekaplan.com

mrussell@finekaplan.com

*Counsel for Plaintiff UFCW Local 1500*
*Welfare and the Classes*